# The Constitutional Separation of Powers Between the President and Congress

This memorandum provides an overview of the constitutional issues that periodically arise concerning the relationship between the executive and legislative branches of the federal government. Although that relationship is shaped in part by the policy and political concerns of the President and Congress of the day, the political interaction between the President and Congress takes place within an enduring constitutional framework that confers powers and responsibilities on both elected branches. In this memorandum we discuss the general principles underlying separation of powers analysis, and we address certain specific questions that have arisen in the past. Any set of examples is necessarily illustrative rather than exhaustive, however, and the Office of Legal Counsel is always available to assist in reviewing legislation or other congressional action for potential separation of powers issues. *

May 7, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSELS
OF THE FEDERAL GOVERNMENT

*Table of Contents*

I. General Principles                                                                          125
    A. Express Procedures: The Bicameralism and Presentment Requirements
       and the Appointments Clause                                          129
    B. The Anti-Aggrandizement Principle                                      131
    C. The General Separation of Powers Principle                            133
II. Common Separation of Powers Issues                                                         135
    A. Bicameralism/Presentment Questions                                    135
    B. Appointments Clause and Related Questions                             139
       1. Who is Required to Be an Officer of the United States?            139
          a. Employment by the Government: The Distinction between
            Appointees and Independent Contractors                       140
          b. The Exercise of Significant Authority                          143
          c. Appointment to a Position of Employment within the Federal
            Government                                                    145
          d. Summary                                                       148
       2. Who May Be an Inferior Officer?                                   149
       3. Who May Appoint Inferior Officers?                                151

---

* This memorandum supersedes a 1989 memorandum that the Office of Legal Counsel provided to the General Counsels' Consultative Group. *See Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248 (1989). While we agree with many of the conclusions of that document, we have determined that subsequent decisions by the Supreme Court and certain differences in approach to the issues make it appropriate to revisit and update the Office's general advice on separation of powers issues.

Editor's Note: This memorandum was issued in 1996 but is being formally published in 2002. We caution that intervening Supreme Court decisions and "certain differences in approach to the issues" discussed herein may render portions of this memorandum inadequate as an expression of the Office's advice on separation of powers. Rather than drafting a superseding memorandum on separation of powers, divorced from a specific context, the Office will provide advice on separation of powers as questions are presented to it.

4. Legislation Lengthening the Tenure of an Officer 153
5. Legislation Imposing Additional Duties on an Officer 157
6. The Ineligibility and Incompatibility Clauses 159
7. The Recess Appointments Clause 161
8. Acting and Interim Appointments 161
9. Other Issues of Combined, Collective, and Interbranch Authority and
    the Appointments Clause 164
C. Removal Power Issues 166
    1. The Executive's Removal Power 166
    2. Congressional Removal Power 170
D. Issues Involving the Boundaries of the Legislative Sphere 171
    1. The Paradox of Congressional Agencies 172
    2. Reporting Requirements 173
    3. Congressional Agents in Non-Legislative Contexts 175
E. The General Separation of Powers Principle 176
F. Statutory Construction 178
III. Constitutional Requirements and Policy Concerns 180

## I. General Principles

The Constitution reflects a fundamental conviction that governmental "power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it." *The Federalist No. 48*, at 332 (James Madison) (Jacob E. Cooke ed., 1961), *quoted in Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273 (1991) ("*MWAA*"). The founders, not content to rely on paper definitions of the rights secured to the people, "viewed the principle of separation of powers as a vital check against tyranny." *Buckley v. Valeo*, 424 U.S. 1, 121 (1976) (per curiam). In order to safeguard liberty, therefore, the Constitution creates three distinct branches of government — Congress, the President, and the federal judiciary — and assigns to them differing roles in the exercise of the government's powers. The resulting division of governmental authority is not a mere set of housekeeping rules indicating which branch presumptively performs which functions; it is, rather, a fundamental means by which the Constitution attempts to ensure free, responsible, and democratic government. *See MWAA*, 501 U.S. at 272 ("The ultimate purpose of this separation of powers is to protect the liberty and security of the governed."). The constitutional separation of powers advances this central purpose by "assur[ing] full, vigorous, and open debate on the great issues affecting the people"; [1] by "placing both substantive and procedural limitations on each

---

[1] *Bowsher v. Synar*, 478 U.S. 714, 722 (1986).

[branch]"; [2] and by maintaining a "system of . . . checks and balances" among the three branches. [3]

Although the structure of the Constitution is designed to obviate the danger to liberty posed by each of the branches, [4] the founders were particularly concerned with the Congress's potential for improvident or overreaching action: "the tendency of republican governments is to an aggrandizement of the legislat[ure] at the expense of the other departments." *The Federalist No. 49*, at 315–16 (James Madison) (Clinton Rossiter ed., 1961), *cited in United States v. Brown*, 381 U.S. 437, 444 n.17 (1965). Many specific aspects of the Constitution's separation of governmental powers embody the founders' "profound conviction . . . that the powers conferred on Congress were the powers to be most carefully circumscribed" and the founders' recognition of the particular " 'propensity' " of the legislative branch " 'to invade the rights of the Executive.' " *INS v. Chadha*, 462 U.S. 919, 947 (1983) (quoting *The Federalist No. 73*, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). Executive branch lawyers thus have a constitutional obligation, one grounded not in parochial institutional interests but in our fundamental duty to safeguard the liberty of the people, to assert and maintain the legitimate powers and privileges of the President against inadvertent or intentional congressional intrusion. As Attorney General William Mitchell put it long ago:

> Since the organization of the Government, Presidents have felt bound to insist upon the maintenance of the Executive functions unimpa[i]red by legislative encroachment, just as the legislative branch has felt bound to resist interferences with its power by the Executive. To acquiesce in legislation having a tendency to encroach upon the executive authority results in establishing dangerous precedents.

*Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 64 (1933). [5]

The Constitution, however, "by no means contemplates total separation of each of these three essential branches of Government." *Buckley*, 424 U.S. at 121. Instead, " '[w]hile the Constitution diffuses power the better to secure liberty, it

---

[2] *MWAA*, 501 U.S. at 272.

[3] *Morrison v. Olson*, 487 U.S. 654, 693 (1988). James Madison described the "policy" lying behind "distributions of power"—"the constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other." *The Federalist No. 51*, at 349 (James Madison) (Jacob E. Cooke ed., 1961), *quoted in Buckley*, 424 U.S. at 122–23.

[4] *See INS v. Chadha*, 462 U.S. 919, 951 (1983) (the Constitution's separation of powers is designed to counteract the "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power").

[5] The Attorney General noted that "[t]he first presidential defense of the integrity of the powers of the Executive under the Constitution was made by Washington himself" and that "[f]rom that day to this the Presidents, with very few exceptions, have felt the necessity for refusing to overlook encroachments upon the executive power." 37 Op. Att'y Gen. at 64.

also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). The Constitution thus guards against "the accumulation of excessive authority in a single Branch" not by providing mutually exclusive lists of executive, legislative, and judicial powers, but by imposing on each of the three branches "a degree of overlapping responsibility, a duty of interdependence as well as independence." *Id.* at 381. [6] The constitutional boundaries between the powers of the branches must be determined "according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928).

Some general observations on the sources and methodology we employ in analyzing separation of powers questions are appropriate. We believe that the constitutional structure obligates the executive branch to adhere to settled judicial doctrine that limits executive and legislative power. While the Supreme Court's decisions interpreting the Constitution cannot simply be *equated* with the Constitution, we are mindful of the special role of the courts in the interpretation of the law of the Constitution. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The Supreme Court's decisions interpreting the constitutional separation of powers among Congress, the President, and the courts recognize the founders' basic concern over the "encroaching nature" of power, as well as their specific belief that Congress is potentially the most dangerous branch. "It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'" *Mistretta*, 488 U.S. at 382 (quoting *Chadha*, 462 U.S. at 951). The Court's decisions have employed three distinct principles in resolving separation of powers disputes. First, where "[e]xplicit and unambiguous provisions of the Constitution prescribe and define . . . just how [governmental] powers are to be exercised," *Chadha*, 462 U.S. at 945, the constitutional procedures must be followed with precision. Second, where the effect of legislation is to vest Congress itself, its members, or its agents with " 'either executive power or judicial power,' " the statute is unconstitutional. *MWAA*, 501 U.S. at 274 (quoting *Hampton*, 276 U.S.

---

[6] The Supreme Court repeatedly has rejected the " 'archaic view of the separation of powers as requiring three airtight departments of government.'" *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977) (quoting *Nixon v. Administrator of Gen. Servs.*, 408 F. Supp. 321, 342 (D.D.C. 1976)). In doing so, the Court has noted that such a view is "inconsistent with the origins of th[e] doctrine" as well as with "the contemporary realities of our political system." *Id.* at 441; *see also id.* at 442 & n.5 (noting that James Madison in *The Federalist No. 47* and Justice Joseph Story in his famous treatise on the Constitution rejected the claim that the Constitution requires an absolute separation).

at 406). [7] Finally, legislation that affects the functioning of one of the other branches may be unconstitutional if it prevents the affected branch "from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. at 443 (legislation affecting the executive branch); *accord CFTC v. Schor*, 478 U.S. 833, 851, 856–57 (1986) (legislation affecting the judiciary). [8]

Our analyses are guided and, where there is a decision of the Court on point, governed by the Supreme Court's decisions on separation of powers. At the same time, the executive branch has an independent constitutional obligation to interpret and apply the Constitution. [9] That obligation is of particular importance in the area of separation of powers, where the issues often do not give rise to cases or controversies that can be resolved by the courts. This is due in part to the limits of jurisdiction and justiciability that Article III places on the courts. In addition, there may be legislation that violates one of the three principles outlined above and yet is unlikely to reach the courts in a form or context in which the judiciary will be able to identify or remedy the constitutional problem. [10] The Attorneys General and this Office have a long tradition of carrying out this constitutional responsibility, one that dates back to Attorney General Edmund Randolph's 1791 opinions on the constitutionality of a national bank. *See The Constitutionality of the Bank Bill* (1994) (reprinting, with commentary, the bank opinions), *reprinted in* H. Jefferson Powell, *The Constitution and the Attorneys General* 3 (1999). [11] We believe therefore that it is important in addressing separation of powers matters to give careful consideration to the views of our predecessors and to what seems to us to be the import of the Constitution's text, history, and structure. [12]

To be sure, respect for the legislative branch of the government requires a degree of deference to legislative judgments. [13] However, it is also the President's

---

[7] We shall refer to this theme in the Supreme Court's separation of powers jurisprudence as "the anti-aggrandizement principle."

[8] We refer to this line of reasoning as "the general separation of powers principle."

[9] Indeed, Article II specifically requires the President to take an oath or affirmation "to preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8.

[10] An example of such legislation would be an enactment that does not, when viewed in isolation, violate the constitutional principles we have identified, but as to which constitutional difficulties arise when the statute is examined in conjunction with other similar enactments. Because, absent a refusal by the executive to enforce any of these cumulative enactments, the courts may not have an opportunity to review the statute in its full context, it is incumbent upon the executive to object to such legislation before it becomes law. Burdensome reporting requirements may illustrate this problem. Even if no single reporting requirement violates the general separation of powers principle, *see Administrator of Gen. Servs.*, 433 U.S. at 443, the cumulative effect of many such requirements might prevent the executive from acting with the dispatch and efficiency that the Constitution intends and that, indeed, Congress expects.

[11] Persuaded by Secretary of the Treasury Hamilton's opinion defending the validity of the legislation, President Washington declined to accept the Attorney General's arguments that the bank bill was unconstitutional and signed it into law. The Supreme Court upheld the President's conclusion that Congress could charter a national bank in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

[12] For an example of an opinion that is, in our view, an exemplary model of the approach this Office should take in interpreting the Constitution. *See Article II, Section 2, Clause 3—Recess Appointments—Compensation (5 U.S.C. § 5503)*, 3 Op. O.L.C. 314 (1979).

[13] From the beginning of the Republic, the executive branch has interpreted the Constitution with a due regard for the constitutional views of Congress. *See, e.g.*, Thomas Jefferson, The Constitutionality of the Bill for Establishing

"duty to pass the executive authority on to his successor, unimpaired by the adoption of dangerous precedents." *Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. at 65. [14] Our constitutional analyses are informed by both of these concerns. [15]

## A. Express Procedures: The Bicameralism and Presentment Requirements and the Appointments Clause

While the expression "separation of powers" does not appear in the Constitution, the Constitution does require both separation and interdependence on some matters by specifying, expressly and precisely, the procedures that must be followed. Where the constitutional text is unequivocal as to the manner in which the branches are to relate, any attempt to vary from the text's prescriptions is invalid. [16] The Court has identified two such express procedures relating to the separation of executive and legislative powers: the bicameralism and presentment requirements for legislation, and the Appointments Clause.

Congress's broad authority to take action that has "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch," *INS v. Chadha*, 462 U.S. at 952, is limited by the procedural requirements of Article I. With a few express exceptions found or rooted in the constitutional text, *see MWAA*, 501 U.S. at 276 n.21, [17] Article I requires that

a National Bank (Feb. 15, 1791) (Opinion of the Secretary of State), *in* 5 *Writings of Thomas Jefferson* 284, 289 (Paul L. Ford ed., 1895) (arguing that the President should not veto a bill on constitutional grounds, "if the pro and the con hang so even as to balance his judgment," out of "a just respect for the wisdom of the legislature"). Respect for Congress also demands that the Executive, like the judiciary, construe statutes so as to avoid constitutional problems. *See, e.g., Appropriations Limitation for Rules Vetoed by Congress*, 4B Op. O.L.C. 731, 732 n.3 (1980) ("It is our practice to interpret statutes in ways that avoid constitutional infirmities, whenever possible.").

[14] Thus, for example, in declining to comply with a request from the House of Representatives that he deemed an intrusion on the treaty power, President Washington explained that "as it is essential to the due administration of the government, that the boundaries fixed by the [C]onstitution between the different departments should be preserved: A just regard to the Constitution and to the duty of my Office . . . forbids a compl[i]ance with your request." Message to the House of Representatives (Mar. 30, 1796), *reprinted in* 35 *Writings of George Washington* 5 (John C. Fitzpatrick ed., 1940).

[15] The correct resolution of separation of powers questions demands that due respect be given to two distinct constitutional axioms. The first axiom is that the Constitution's creation of a vigorous Executive and an independent judiciary must not be undermined by legislative encroachment. The second axiom is that the Constitution delegates to Congress broad power "[t]o make *all* Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [of Congress], and *all* other Powers vested by this Constitution in the Government of the United States, or in *any* department or officer thereof." U.S. Const. art. I, § 8, cl. 18 (emphasis added). The Necessary and Proper Clause thereby authorizes Congress not only to choose any appropriate means of exercising the legislative powers it has been delegated, but also "to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government" as a whole, *M'Culloch v. Maryland*, 17 U.S. at 420, including the powers vested in the President. In our analyses, we fully acknowledge the broad sweep of Congress's powers while insisting, as we must, that those powers cannot be legitimately employed so as to undermine the constitutional authority of the executive branch.

[16] In such circumstances "the balance" between the branches "already has been struck by the Constitution itself" in the text. *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring).

[17] The House of Representatives has the power to impeach any civil officer of the United States, *see* U.S. Const. art. I, § 2, cl. 5; *id.* art. II, § 4, and the Senate has the power to try and, if convinced that the officer is guilty of "high Crimes and Misdemeanors," to remove him or her from office. *Id.* art. I, § 3, cls. 5, 6; *id.* art. II, § 4.

Continued

129

Congress take such action "in accord with a single, finely wrought and exhaustively considered, procedure" — bicameral passage and presentation to the President followed by presidential signature, or bicameral repassage by a two-thirds majority. *Chadha*, 462 U.S. at 951; *see* U.S. Const. art. I, §§ 1, 7. The classic and often-repeated violation of this express textual requirement is the "legislative veto" mechanism invalidated in *Chadha*. [18]

The Supreme Court has applied a similar analysis to the Appointments Clause of Article II, Section 2. In *Buckley v. Valeo*, 424 U.S. 1, 138–39 (1976) (per curiam), the Court concluded that "Congress' power under [the Necessary and Proper] Clause is inevitably bounded by the express language of Art. II, § 2, cl. 2," and that consequently Congress cannot provide for the appointment of "Officers of the United States," except through a procedure that "comports with" the Appointments Clause. [19] Pursuant to the language of the Clause, principal officers must be appointed by the President with the advice and consent of the Senate, while Congress is limited in providing alternative means for the appointment of inferior officers to the "possible repositories for the appointment power." *Freytag v. Commissioner*, 501 U.S. 868, 884 (1991). Those repositories are "the President alone, . . . the Courts of Law, or . . . the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

The rules of law derived from the requirements of bicameralism/presentment and the Appointments Clause have the clear and powerful effect of invalidating any inconsistent congressional action. Congress may not employ any mode of exercising legislative power other than through bicameralism and presentment. The Appointments Clause's list of those who may appoint officers is exclusive, and Congress cannot authorize *anyone* else to appoint officers of the United States. The major difficulty in applying the bicameralism/presentment and Appointments Clause requirements lies in determining whether a particular action falls within the scope of the prescribed procedures. In section II of this memorandum, we discuss questions that have arisen concerning the scope of both requirements.

---

The Senate also acts on its own in exercising its advice and consent powers with respect to treaties and the appointment of officers. Congress and congressional committees, furthermore, may take certain actions in aid of Congress's legislative tasks that have legal consequences for specific persons outside the legislative branch; a congressional committee, for example, may issue a subpoena to a witness. *See Lear Siegler, Inc. Energy Prods. Div. v. Lehman*, 842 F.2d 1102, 1108 (9th Cir. 1988), *modified as to attorney fees*, 893 F.2d 205 (9th Cir. 1989) (en banc). We disagree with the *Lear Siegler* court's application of this principle to the question before it.

[18] The statute at issue in *Chadha* provided for a one-house "veto" of certain decisions by the Attorney General. A two-house "veto" satisfies bicameralism but is inconsistent with the requirement of presentment, and soon after *Chadha* the Court summarily invalidated a statute employing this mechanism. *See United States Senate v. FTC*, 463 U.S. 1216 (1983) (mem.). These Supreme Court decisions vindicated the executive branch's long-held objections to any form of legislative "veto." *See* Memorandum for the Attorney General from President Franklin D. Roosevelt (Apr. 7, 1941), *reprinted in* Robert H. Jackson, *A Presidential Legal Opinion*, 66 Harv. L. Rev. 1353, 1357–58 (1953) (concurrent resolution); *Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. at 60–62 (joint congressional committee); *Constitutional Issues Raised by Inter-American Convention on International Commercial Arbitration*, 4B Op. O.L.C. 509, 512–13 (1980) (one-house veto of "private" action).

[19] *Buckley* vindicated the long-standing constitutional view of the executive branch. *See, e.g., Constitutionality of Resolution Establishing United States New York World's Fair Commission*, 39 Op. Att'y Gen. 61 (1937).

## B. The Anti-Aggrandizement Principle

Although the founders were concerned about the concentration of governmental power in any of the three branches, their primary fears were directed toward congressional self-aggrandizement, [20] and the Supreme Court's decisions call for careful scrutiny of legislation that has the purpose or effect of extending Congress's authority beyond the legislative process. Just as the textual requirement of bicameralism and presentment limits the means by which Congress may legislate, so the anti-aggrandizement principle limits the means by which Congress may influence the execution (or adjudication) of the laws. [21] The Constitution affords Congress great latitude in making policy choices through the process of bicameral passage and presentment. However, "once Congress makes its choice in enacting legislation, its participation ends," and "Congress can thereafter control the execution of its enactment only indirectly — by passing new legislation." *Bowsher v. Synar*, 478 U.S. at 733–34. While Congress may inform itself of how legislation is being implemented through the ordinary means of legislative oversight and investigation, the anti-aggrandizement principle forbids Congress, directly or through an agent subject to removal by Congress, [22] from intervening in the decision making necessary to execute the law. *See id.* at 733–34; *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994). [23]

In *Bowsher*, the Court held that a provision of the Gramm-Rudman Deficit Reduction Act was unconstitutional because it vested in the Comptroller General (an official "removable only at the initiative of Congress," 478 U.S. at 728) the power to make post-enactment decisions about how the executive branch should implement budget reduction legislation. The Court rejected the argument that self-aggrandizing legislation can be upheld when it is as a practical matter harmless or de minimis and dismissed as beside the point Justice White's vigorous argument

[20] *See Mistretta*, 488 U.S. at 411 n.35 (distinguishing *Bowsher*, as resting on "the special danger recognized by the Founders of congressional usurpation of Executive Branch functions").

[21] The fact that the anti-aggrandizement principle does not rest on a particular provision of the Constitution does not make it any less important and legitimate a feature of the law of separation of powers than those features such as bicameralism and presentment that do have specific textual loci:

> The Framers regarded the checks and balances they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other. . . . This Court has not hesitated to enforce the principle of separation embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it.

*Buckley v. Valeo*, 424 U.S. at 122–23.

[22] "The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess." *Bowsher*, 478 U.S. at 726. An officer subject to removal by Congress is subordinate to Congress as a matter of constitutional law and must be viewed as an agent of Congress for separation of powers purposes. *Id.* at 730. The Constitution expressly prescribes the only means by which the houses of Congress may participate in the removal from an ongoing office of a non-legislative official — impeachment by the House and trial by the Senate. *Id.* at 723.

[23] *Bowsher* upheld the view of the Constitution long maintained by the executive branch. *See, e.g., Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 56 (1933) (unconstitutional for Congress to give a joint committee of Congress authority "to approve or disapprove executive acts").

that "[r]ealistic consideration of the nature of the Comptroller General's relation to Congress . . . reveals that the threat to separation of powers . . . is wholly chimerical." 478 U.S. at 774 (White, J., dissenting); *see also MWAA*, 501 U.S. at 269 n.15 (finding that "the likelihood that Congress" actually would exercise its authority to remove the members of the review board under consideration in *MWAA* was "irrelevant for separation-of-powers purposes"). In contrast, the Court upheld the validity of the laws challenged in *Morrison v. Olson* (independent counsel provisions of Ethics in Government Act of 1978) and *CFTC v. Schor*, 478 U.S. 833 (1986) (regulations implementing section of the Commodity Exchange Act), in part because the Court saw no reason to view those laws as examples of legislative aggrandizement.[24]

Like the express requirements of the bicameralism/presentment process and the Appointments Clause, the anti-aggrandizement principle puts a powerful constraint on congressional power: legislative action that falls within the scope of the principle is unconstitutional.[25] The complementary limit on the principle is that, as the Court understands it, the principle applies only to congressional action that amounts to *formal or direct* self-aggrandizement — for example, the placement of congressional agents on a body with prosecutorial or law enforcement powers — no matter how limited the power thereby seized by Congress. *See NRA Political Victory Fund*, 6 F.3d at 826–27. The Court reviews legislation that arguably increases Congress's power *indirectly* by weakening the Executive politically under the less stringent general separation of powers principle. *See Morrison*, 487 U.S. at 694. A significant difficulty in applying the anti-aggrandizement principle arises from the uncertain line between minor (but unconstitutional) aggrandizements and (constitutional) exercises of Congress's broad investigative and oversight powers.[26] In section II, we discuss some of the questions that have arisen.

---

[24] *Morrison*, 487 U.S. at 694 ("We observe first that this case does not involve an attempt by Congress to increase its own powers at the expense of the Executive Branch."); *Schor*, 478 U.S. at 856 ("Unlike *Bowsher*, this case raises no question of the aggrandizement of congressional power at the expense of a coordinate branch.").

[25] The bicameralism/presentment and anti-aggrandizement requirements converge when Congress attempts to vest in itself or its agents the power to take action with legal effects outside the legislative branch by some means other than the textually prescribed procedure of bicameral passage of a bill and presentation to the President. Such an attempt is unconstitutional regardless of whether one views the attempt as a violation of the bicameralism/presentment requirement for legislation or as a self-aggrandizing intrusion into the sphere of activity of another branch. *See MWAA*, 501 U.S. at 274–77. However, the two requirements do not always work in tandem. A statute providing that the President can exercise additional authority over some issue with the approval of a single house of Congress would not amount to congressional self-aggrandizement but would violate the bicameralism requirement. Similarly, it is difficult to view the designation by statute of agents of Congress to be non-voting members of an extra-legislative decision-making body as leading to the exercise of legislative authority in violation of *Chadha*, but such designation may well run afoul of the anti-aggrandizement principle. *See, e.g., NRA Political Victory Fund*, 6 F.3d at 826–27.

[26] *Compare NRA Political Victory Fund*, 6 F.3d at 826–27 (unconstitutional for Congress to place agents within an entity exercising final decision-making authority) *with McGrain v. Daugherty*, 273 U.S. 135 (1927) (constitutional for Congress to issue subpoenas).

## C. The General Separation of Powers Principle

Legislation that affects the constitutional separation of powers but is consistent with the requirements of bicameralism/presentment, the Appointments Clause, and the anti-aggrandizement principle is subject to less searching scrutiny. [27] While some older judicial opinions used language suggesting that any overlap between the powers wielded by the different branches is illegitimate, [28] the modern Supreme Court interprets the general principle of separation of powers in light of Madison's assertion that the separation necessary to free government is violated only " 'where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department.' " *Nixon v. Administrator of Gen. Servs.*, 433 U.S. at 442 n.5 (quoting *The Federalist No. 47*, at 325–26 (James Madison) (Jacob E. Cooke ed., 1961)). [29] Therefore, "in determining whether [an] Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443; *cf. CFTC v. Schor*, 478 U.S. at 856–57 ("[T]he separation of powers question presented in this litigation is whether Congress impermissibly undermined . . . the role of the Judicial Branch."). An affirmative answer to the question of whether Congress has prevented the Executive or Judiciary from accomplishing its functions, furthermore, would not lead inexorably to the judicial invalidation of the statute: in that case, the Court has stated, it would proceed to "determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Administrator of Gen. Servs.*, 433 U.S. at 443. [30]

---

[27] Legislation impinging on the President's responsibilities in the areas of foreign affairs and national defense poses unique issues in the application of the general principle of separation of powers, requiring a more searching examination of the validity of congressional action.

[28] *See, e.g., Springer v. Philippine Islands*, 277 U.S. 189, 201 (1928) (discussing the "exclusive character of the powers conferred upon each of the three departments"). On the present Court, Justice Scalia adheres to a version of this view. *See, e.g., Morrison*, 487 U.S. at 703–04 (Scalia, J., dissenting) (criticizing the Court for focusing on "such relatively technical details as the Appointments Clause and the removal power" rather than on "the principle of separation of powers").

[29] Madison's language about "the *whole* power of [a] department" should not be construed in a woodenly literalistic manner. As the Supreme Court's decisions indicate, the point is that the principle of separation of powers safeguards the overall constitutional role and function of the affected branch. Indeed, this would seem to have been Madison's view as well: during the great debate in the First Congress over the President's authority to remove executive branch officers, Madison argued against congressional power to limit the President's authority on the ground that such limitations would distort the constitutionally ordained role of the Executive. *See Myers v. United States*, 272 U.S. 52, 131 (1926) (quoting Madison).

[30] Although most of the Court's decisions applying the general separation of powers principle have concerned legislation arguably interfering with the executive or judiciary, the Court's approach is applicable in other circumstances as well. For example, *United States v. Nixon*, 418 U.S. 683 (1974), addressed the argument that a subpoena duces tecum addressed to the President in the course of a criminal proceeding was a judicial encroachment on the Executive's autonomy. The Court rejected the argument, holding in the circumstances of the case that the President's "generalized interest in confidentiality" was outweighed by "the demonstrated, specific need [of the courts and the accused] for evidence in a pending criminal trial." *Id.* at 713. The threat to the President's constitutionally based interest posed by compelled disclosure in such (presumably rare) circumstances was slight, the Court concluded, while "the allowance of the privilege to withhold evidence . . . would . . . gravely impair the basic function of the courts." *Id.* at 712. The Court built on its reasoning in *United States v. Nixon* in formulating the

Continued

The Court's current understanding of the general principle of separation of powers is illustrated by *Morrison v. Olson*.[31] There the Court concluded that the restrictions in the independent counsel statute on the Executive's supervisory and removal powers did not violate the principle. While the Court acknowledged that the statute rendered the independent counsel "free from Executive supervision to a greater extent than other federal prosecutors," it was unpersuaded that the limitations placed on that supervision meant that the President would not be able "to perform his constitutionally assigned duties." 487 U.S. at 696.[32] In light of the narrow range of the independent counsel's jurisdiction, her essential insulation from any significant policy-making role, and the well-established principle that Congress can limit the removal authority of a head of department when granting that officer the power to appoint subordinates, the Court concluded that the independent counsel statute did not fundamentally undermine the Executive's constitutional authority.

The Supreme Court's basic formulation of the general principle of separation of powers is consistent with the approach taken by most Attorneys General in the past, and it accords with what we find to be the most persuasive scholarship on the original understanding and early practice of the separation of powers under the United States Constitution.[33] However, given the very emphasis the general principle places on evaluating constitutional questions in light of the overall structure and functioning of the federal government, the principle's application to spe-

---

test set out a few years later in *Administrator of General Services*, under which it examined the impact of an adverse decision on the constitutional functions of the executive and judicial branches.

[31] *See also Mistretta. Mistretta* upheld the validity of Congress's decision to create the Sentencing Commission as an independent entity within the judicial branch composed, in part, of Article III judges against the claim that the Commission violated the general separation of powers principle. 488 U.S. at 383. As in *Morrison*, the Court looked to the impact of the challenged legislation on the ability of the affected branch to fulfill its duties and concluded that the legislation posed no real threat to the integrity or authority of the judiciary. 488 U.S. at 384.

[32] The Court also addressed the statute's imposition of a for-cause requirement on the Attorney General's power to remove an independent counsel, arguably a violation of the rule of *Myers v. United States*, 272 U.S. 52 (1926) (holding unconstitutional a statute requiring Senate advice and consent to the presidential removal of certain postmasters). *Morrison* distinguished *Myers* as based on what we have called the anti-aggrandizement principle, 487 U.S. at 686 (like *Bowsher v. Synar, Myers* involved "Congress' attempt to involve itself in the removal of an executive official"), and rejected the argument that the constitutionality of a for-cause removal requirement depends on whether an official is classified as "purely executive," *id.* at 689. The proper inquiry, the Court concluded, was the compatibility of the restriction on the Executive's removal power with the general separation of powers principle that Congress cannot legislate in such a way that the President cannot carry out his constitutional functions. Ultimately, the Court was "simply [unable to] see how the President's need to control the [counsel's] exercise of . . . discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691–92.

[33] While we do not rest any conclusions on the potentially shifting ground of scholarly consensus, we note the existence of a number of impressive studies arguing that the principle of separation was originally understood to be flexible, open-ended, and consistent with a variety of actual institutional relationships among the three branches. Furthermore, it seems undeniable that early *practice* under the Constitution reflected a loose rather than strict understanding of the required separation. *See, e.g.*, Susan Low Bloch, *The Early Role of the Attorney General in our Constitutional Scheme: In the Beginning There was Pragmatism*, 1989 Duke L.J. 561; Gerhard Casper, *An Essay in Separation of Powers: Some Early Versions and Practices*, 30 Wm. & Mary L. Rev. 211 (1989); William B. Gwyn, *The Indeterminacy of the Separation of Powers and the Federal Courts*, 57 Geo. Wash. L. Rev. 474 (1989); Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 93 Colum. L. Rev. 1 (1994); Peter M. Shane, *Independent Policymaking and Presidential Power: A Constitutional Analysis*, 57 Geo. Wash. L. Rev. 596 (1989).

cific questions is unavoidably difficult, and the answers we or the courts reach ordinarily should be viewed as quite specific to context. [34] Furthermore, although the general principle marks the boundary of the *law* of separation of powers, it is inappropriate for the Executive to regard this as defining the outer limit of proper separation of powers *policy* objections to legislation. [35] The Constitution's very structure suggests the importance of maintaining the hallmarks of "executive administration essential to effective action" [36] as well as the accountability to the public that stems from vesting ultimate authority in a single, politically responsible officer. [37] Several quite common types of legislation threaten the structural values protected by the general separation of powers principle even if the courts are unlikely to invalidate them. Examples of such legislation may include burdensome reporting requirements, attempts to dictate the processes of executive deliberation, and legislation that has the purpose or would have the effect of "micromanaging" executive action. Executive branch agencies should be careful to object to any legislation that unduly reduces the accountability of officials or agencies to the President, or that unnecessarily interferes with the flexibility and efficiency of executive decision making and action. Such legislation undercuts the constitutional purpose of creating an energetic and responsible executive branch.

## II. Common Separation of Powers Issues

### A. Bicameralism/Presentment Questions

The Supreme Court's holding in *INS v. Chadha* was emphatic: Congress can exercise "the legislative power of the Federal Government" *only* "in accord with a single, finely wrought and exhaustively considered, procedure" — passage by

---

[34] Once again, we note that the areas of foreign relations and national defense present unique considerations, in light of the President's much greater constitutional authority to act in those areas.

[35] In analyzing the validity of congressional action, we are mindful of the respect it is appropriate for the executive branch to pay to an equal and coordinate branch of the government. However, the executive branch is not bound by precisely the same rules of deference that guide the courts in exercising their power of judicial review. Judicial deference to the legislative choices embodied in statutes is one of the means by which the courts themselves avoid interfering improperly with the constitutional powers of the politically responsible branches. (In the case of most statutes, judicial review involves scrutinizing the legal and policy judgments of the President who signed the legislation into law as well as those of the Congress that enacted it.) The courts, it should be remembered, are also deferential to purely executive branch decisions, and for the same basic reason: the constitutional structure makes the President, like Congress, politically responsible. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865 (1984) ("While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make . . . policy choices.").

[36] *Myers*, 272 U.S. at 134.

[37] Rejecting the argument that it was unsafe to delegate the executive power to a single official, Alexander Hamilton wrote that "one of the weightiest objections to a plurality in the executive . . . is that it tends to conceal faults, and destroy responsibility." *The Federalist No. 70*, at 476 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), *cited in In re Sealed Case*, 838 F.2d 476, 527 n.27 (D.C. Cir.) (Ginsburg, R.B., J., dissenting), *rev'd., Morrison v. Olson*, 487 U.S. 654 (1988). Then-Judge Ginsburg explained that "[t]he unity of the executive branch was intended to serve the ends of responsibility and accountability." *Id.*

both houses and presentment to the President. [38] 462 U.S. at 951. Applying that rule, the Court struck down a statutory mechanism in the Immigration and Nationality Act by which a single house of Congress could override decisions of the Attorney General. The effect of the Court's decision was to invalidate the similar "legislative veto" provisions found in many other statutes. [39] In addition to the classic legislative veto mechanism invalidated by *Chadha*, we think that the requirement of bicameralism and presentment is infringed whenever a single house, committee, or agent of Congress attempts to direct the execution of the laws, to determine the "final disposition of the rights of persons outside the legislative branch," or to promulgate rules or standards intended to bind the actions of executive or administrative officials that have not been approved by both houses and presented to the President. *See, e.g., Lear Siegler, Inc., Energy Prods. Div. v. Lehman*, 842 F.2d 1102, 1108 (9th Cir. 1988), *modified as to attorney fees*, 893 F.2d 205 (1989) (en banc); [40] *cf. Mistretta v. United States*, 488 U.S. at 396 (distinguishing Sentencing Guidelines from political policy making on the grounds that "they do not bind or regulate the primary conduct of the public").

For many decades, the congressional Joint Committee on Printing ("JCP") has attempted to exercise the legislative authority to promulgate rules and procedures binding on the executive branch's activities relating to printing, publication, and (more recently) data storage. In 1920, President Wilson vetoed an appropriations bill because it purported to confer on the JCP the power to promulgate regulations governing printing by executive officials or agencies: Congress has no power, he explained, to "endo[w] a committee of either House or a joint committee of both Houses with power to prescribe 'regulations' under which executive departments may operate." Veto Message on Legislative, Executive and Judicial Appropriation Bill, H.R. No. 764, 66th Cong., 2d Sess. 2 (1920), *reprinted in* 59 Cong. Rec. 7026 (1920); *see Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 62–63, 65 (1933) (quoting and endorsing President Wilson's reasoning). In 1984, we concluded that legislation granting the JCP authority to promulgate regulations that "would require executive departments to

---

[38] As a matter of practical reality, much of the federal government's legislative activity is undertaken by officers and agencies outside the legislative branch (in the form of regulations), but as a rule such entities act under statutory delegation from Congress. The delegating legislation is, for *Chadha* purposes, the congressional exercise of legislative power. *See Chadha*, 462 U.S. at 953 n.16.

[39] A statutory provision conditioning the Executive's ability to take action on approval by one or both houses of Congress or by a congressional committee is as invalid as a provision enabling one of these bodies to "veto" executive action, and for the same reason: it is a legislative attempt to exercise authority beyond the legislative sphere in a mode not conforming to the requirements of bicameralism and presentment. *See, e.g., American Fed'n of Gov't Employees v. Pierce*, 697 F.2d 303, 306 (D.C. Cir. 1982).

[40] We agree with the court of appeals in *Lear Siegler* that many separation of powers issues can properly be analyzed under either the *Chadha* rule (forbidding Congress to exercise *legislative* power except by bicameralism and presentment) or the anti-aggrandizement principle (forbidding Congress to exercise *executive* power). Attempts to resolve constitutional issues by categorizing an exercise of authority as "in its essence, 'legislative' or 'executive'," can be confusing and, in any event, miss the point that under either analysis, "the critical issue is whether Congress or its agent seeks to *control* . . . the execution of its enactments without respect to the Article I legislative process." 842 F.2d at 1108. In *MWAA*, the Supreme Court concluded that it was unnecessary to resolve the categorization issue because the exercise of authority was unconstitutional however it was viewed. 501 U.S. at 276.

submit annual plans outlining their intended activities and to seek advance approval of all projected goals, policies, strategies, purchases, publications, and means of distribution'' with respect to printing, word processing, and data storage and retrieval was unconstitutional. *Constitutionality of Proposed Regulations of Joint Committee on Printing*, 8 Op. O.L.C. 42, 42 (1984). The proposed regulations would have established general rules binding upon the conduct of executive officials without those rules being approved by both houses of Congress and presented to the President, in plain violation of Article I's procedural requirements.[41] We have also advised that the statutory provision authorizing the JCP ''unilaterally to create exceptions to the [statutory] rule that all printing must be accomplished through the GPO [Government Printing Office]'' has no lawful force under *Chadha. Id.* at 51 & n.14; *see also Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. at 58–60 (bill subjecting Treasury Department decisions on tax refunds to review and disallowance by congressional joint committee would be unconstitutional).

The requirement of bicameralism and presentment also can be violated in more convoluted ways. Section 431 of the General Education Provisions Act, for example, subjected final regulations of the Department of Education to a forty-five day report-and-wait provision[42] and provided that the final regulation would not become effective if Congress ''by concurrent resolution, find[s] that the final regulation is inconsistent with the Act . . . and disapprove[s] such final regulation.'' 20 U.S.C. § 1232(d) (Supp. IV 1980). Concurrent resolutions are not legislation within the meaning of the Constitution, *see* U.S. Const. art. I, § 7, cl. 3, because they are not presented to the President. Accordingly, Attorney General Civiletti advised the Secretary of Education that the subjection of the Education Department's delegated lawmaking authority to congressional control and revision by means other than those required by Article I was unconstitutional. ''[O]nce a function has been delegated to the executive branch, it must be performed there, and cannot be subjected to continuing congressional control except through the constitutional process of enacting new legislation.'' *Constitutionality of Congress' Disapproval of Agency Regulations by Resolutions Not Presented to the President*, 4A Op. O.L.C. 21, 27 (1980) (opinion of the Attorney General).

Similarly, while Congress has near-plenary authority in deciding to grant, limit or withhold appropriations, the Department of Justice has long contended that the appropriations power may not be used to circumvent the restrictions the Constitution places on the modes of legislative action. *See, e.g., Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230 (1955) (opining that legislation authorizing congressional committees to dis-

---

[41] We also determined that the proposed regulations were not authorized by any of the statutes concerning the JCP. *See* 8 Op. O.L.C. at 43–46. That point was not relevant to the constitutional analysis, however, since Congress cannot circumvent the bicameralism and presentment requirement by delegating legislative authority to a part or agent of itself even by means of a statute itself duly passed and presented.

[42] In themselves report-and-wait mechanisms usually are valid, as we discuss more fully later in this memorandum.

approve Defense Department contracts is unconstitutional). Several years before *Chadha*, for example, this Office advised that Congress could not validly provide for the indirect implementation of a legislative "veto" by an appropriations rider that would prospectively deny funding for the implementation of any regulation disapproved in the future by such a "veto." *See Appropriations Limitation for Rules Vetoed by Congress*, 4B Op. O.L.C. 731 (1980). Our reasoning in that opinion is equally applicable to appropriations provisions that attempt to cut off funding that would otherwise be available on the basis of any future expression of disapproval by Congress that does not take the form of new legislation. The same analysis would apply, as well, to a provision prohibiting the expenditure of funds for some purpose, but allowing a future expression of approval by committee action to remove the prohibition.

In carrying out its legitimate legislative functions, Congress "enjoys ample channels to advise, coordinate, and even directly influence an executive agency [including by] direct communication with the [agency]." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994). As a practical matter, therefore, congressional committees and individual members of Congress often are able to sway the decisions of the executive officials with whom they deal. In addition, congressional committees can exercise limited but legally coercive authority over persons outside the legislative branch through the power to issue subpoenas to compel testimony. [43] In light of the capacity of Congress to extend its influence beyond the legislative sphere by informal means that are sometimes troubling although not unlawful, it is imperative that the executive branch consistently assert the rule of constitutional law that formal control of executive decisionmaking and administration is subject to the requirements of Article I, and especially to the constitutional authority of the President to participate in the legislative process through the presentment mechanism. The executive branch has a constitutional obligation not to accede to legislative action that does not conform to Article I. Advising the Secretary of Education that she could validly implement departmental regulations despite a legislative "veto," Attorney General Civiletti wrote that "recognition of these concurrent resolutions as legally binding would constitute an abdication of the responsibility of the executive branch, as an equal and coordinate branch of government with the legislative branch, to preserve the integrity of its functions against constitutional encroachment." *Congress' Disapproval of Agency Regulations*, 4A Op. O.L.C. at 29.

---

[43] The Supreme Court has reasoned that the "congressional power of inquiry" is necessary to " 'enable [Congress] efficiently to exercise [the] legislative function[s] belonging to it under the Constitution.'" *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 160 (1927)) Like Congress's substantive powers to legislate, the power of inquiry is "subject to the limitations placed by the Constitution on governmental action," *id.* at 112, including the anti-aggrandizement and general separation of powers principles.

## B. Appointments Clause and Related Questions

The Appointments Clause provides:

> [The President,] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, §2, cl. 2. [44] In *Buckley v. Valeo*, the Supreme Court held that the terms of the Appointments Clause set out the only means by which Congress may provide for the appointment of "Officers of the United States." [45] 424 U.S. at 124–37. Principal officers must be appointed by the President with the advice and consent of the Senate; inferior officers must be appointed in the same manner unless Congress by statute provides for their appointment by the President, the "Head[ ] of [a] Department[ ]," or the courts. *Id.* at 132; [46] *see also Freytag v. Commissioner*, 501 U.S. at 878 ("[T]he Constitution limits congressional discretion to vest power to appoint 'inferior Officers' to three sources."). Despite the apparent clarity of its language, however, the Appointments Clause has provided the occasion for many opinions of the Attorneys General and of this Office. [47]

**1. Who is Required to Be an "Officer of the United States"?** Not everyone who performs duties for the federal government is an "officer" within the meaning of the Appointments Clause. From the early days of the Republic, this term has been understood to embrace the ideas of "tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868). Because

---

[44] As the language of the Appointments Clause suggests, offices in the constitutional sense "are only those established or recognized by the Constitution or by act of Congress." *Inventions International Exposition*, 18 Op. Att'y Gen. 171, 171 (1885); *see also id.* ("[T]he President cannot create an office.").

[45] The officers at issue in *Buckley* were the six voting members of the Federal Election Commission, four of whom were appointed by congressional officials and two by the President, subject to the approval of the Senate and the House of Representatives. The statutory scheme thus violated the Appointments Clause in two distinct ways, by vesting appointment power in officials not listed in the Clause and by subjecting presidential nominees to confirmation by the House. 424 U.S. at 126–27.

[46] *See Appointment of Assistant Secretary of State*, 6 Op. Att'y Gen. 1, 1 (1853) ("[W]ithout there be[ing] express enactment to the contrary . . . the appointment of any officer of the United States belongs to the President, by and with the advice and consent of the Senate.").

[47] We do not state anything novel in observing that the Appointments Clause sometimes presents difficult questions of interpretation. Attorney General Legaré remarked in an 1843 opinion that "[n]o points of our fundamental law are more difficult than those involved in this whole subject of appointments." *Appointment and Removal of Inspectors of Customs*, 4 Op. Att'y Gen. 162, 164 (1843).

*Hartwell* has long been taken as the leading statement of the constitutional meaning of "officer," [48] that statement is worth repeating in full:

> An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

> The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe. A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other.

*Id.* at 393.

*Hartwell* and the cases following it specify a number of criteria for identifying constitutional officers, and in some cases it is not entirely clear which criteria the Court considered essential to its decision. Nevertheless, we believe that from the earliest reported decisions onward, the constitutional definition of officer has involved at least three necessary conditions.

**a. Employment by the Government: The Distinction between Appointees and Independent Contractors.** An officer's duties are permanent, continuing, and based upon responsibilities created through a chain of command rather than by contract. Underlying an officer is an "office," to which the officer must be appointed. As Chief Justice Marshall, sitting as circuit justice, wrote: "Although an office is 'an employment,' it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act, or perform a service, without becoming an officer." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747). Chief Justice Marshall speaks here of being "employed under a contract"; in modern terminology the type of non-officer status he is describing is usually referred to as

---

[48] In an opinion discussing an Appointments Clause issue, Attorney General Kennedy referred to *Hartwell* as providing the "classical definition pertaining to an officer." *Communications Satellite Corporation*, 42 Op. Att'y Gen. 165, 169 (1962). *Hartwell* itself cited several earlier opinions, including *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice), *see* 73 U.S. at 393 n.†, and in turn has been cited by numerous subsequent Supreme Court decisions, including *United States v. Germaine*, 99 U.S. 508, 511–12 (1879), and *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890). These latter two decisions were cited with approval by the Court in *Buckley v. Valeo*, 424 U.S. at 125–26 & n.162.

that of independent contractor. In *Hartwell*, this distinction shows up in the opinion's attention to the characteristics of the defendant's employment being "continuing and permanent, not occasional or temporary," as well as the opinion's suggestion that with respect to an officer, a superior can fix and then change the specific set of duties, rather than having those duties fixed by a contract. 73 U.S. at 393.

The distinction between employees and persons whose relationship to the government takes some other form also appears in later decisions.[49] The question in *United States v. Germaine*, 99 U.S. 508 (1879), concerned whether a surgeon appointed by the Commissioner of Pensions "to examine applicants for pension, where [the Commissioner] shall deem an examination . . . necessary," *id.* at 508 (quoting Rev. Stat. § 4777), was an officer within the meaning of the Appointments Clause. The surgeon in question was "only to act when called on by the Commissioner of Pensions in some special case"; furthermore, his only compensation from the government was a fee for each examination that he did in fact perform. *Id.* at 512. The Court stated that the Appointments Clause applies to "all persons who can be said to hold an office under the government" and, applying *Hartwell*, concluded that "the [surgeon's] duties are *not* continuing and permanent and they *are* occasional and intermittent." *Id.* The surgeon, therefore, was not an officer of the United States.[50]

The Court employed the same reasoning in *Auffmordt v. Hedden*, 137 U.S. 310 (1890). Pursuant to statute, an importer dissatisfied with the government's valuation of dutiable goods was entitled to demand a reappraisement jointly conducted by a general appraiser (a government employee) and a "merchant appraiser" appointed by the collector of customs for the specific case. Despite the fact that the reappraisement decision was final and binding on both the government and the importer, *id.* at 329, the Court rejected the argument that the merchant appraiser was an "inferior Officer" whose appointment did not accord with the requirements of the Appointments Clause.

> He is an expert, selected as such. . . . He is selected for the special case. He has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case. . . . He has no claim or right to be designated, or to act except as he may be designated. . . . His position is without tenure, duration, con-

---

[49] In this memorandum, the term "officer" will be used to refer exclusively to "Officers of the United States" in the constitutional sense; other full-time government servants will be called "employees."

[50] *Germaine* clearly was discussing the concept of "officer" in the constitutional, and not simply a generic, sense: the alternative basis for the holding was that the surgeon was not an officer because he was appointed by the Commissioner who, as the head of a bureau within the Interior Department, could not be a "Head of Department" with the authority to appoint officers. *Id.* at 510–11.

141

tinuing emolument, or continuous duties . . . . Therefore, he is not an 'officer,' within the meaning of the clause.

*Id.* at 326–27.

We believe that under its best reading, *Buckley v. Valeo,* 424 U.S. 1 (1976) (per curiam), reflects and endorses this distinction, and that suggestions to the contrary misread the opinion. First, *Buckley* cites both *Germaine* and *Auffmordt* approvingly. *See id.* at 125–26 & n.162. Second, in several of its statements of the definition of "officers," *Buckley,* sometimes citing *Germaine* explicitly, says that the term applies to *appointees* or *appointed officials* who exercise significant authority under federal law, thus recognizing the possibility that non-appointees might sometimes exercise authority under federal law. *See, e.g., id.* at 131 ("Officers" are "all appointed officials exercising responsibility under the public laws."). It is true that at other points in its opinion, the *Buckley* Court used language that, taken in isolation, might suggest that the Appointments Clause applies to persons who, although they do not hold positions in the public service of the United States, exercise significant authority pursuant to federal law. *See id.* at 141. However, we think such a reading of *Buckley* is unwarranted. So understood, *Buckley* must be taken to have overruled, *sub silentio, Germaine* and *Auffmordt* — cases upon which it expressly relies in its analysis, *see id.* at 125–26 & n.162 — and its repeated quotation of the *Germaine* definition of "officer" as "all persons who can be said to hold an office under the government" would make no sense. The apparently unlimited language of some passages has a simpler explanation: there was no question that the officials at issue in *Buckley* held "employment[s]," *Maurice,* 26 F. Cas. at 1214, under the federal government, and thus the question of the inapplicability of the Appointments Clause to persons not employed by the federal government was not before the Court. [51] The Supreme Court's decision in *Buckley,* we conclude, did not modify the long-settled principle that a person who is not an officer under *Hartwell* need not be appointed pursuant to the Appointments Clause. [52]

---

[51] The post-*Buckley* Supreme Court has often assessed the validity of statutes that would starkly pose Appointments Clause issues if, in fact, the Court had adopted the position that wielding significant authority pursuant to the laws of the United States, without more, requires appointment in conformity with that Clause. In none of these cases has the Court even hinted at the existence of an Appointments Clause issue. *See, e.g., Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568 (1985) (upholding statutory requirement that registrants under a federal regulatory scheme submit to binding arbitration conducted by a panel of arbitrators who are private individuals not appointed by one of the methods specified in the Appointments Clause and are subject only to limited judicial review); *FERC v. Mississippi,* 456 U.S. 742 (1982) (upholding requirement that states enforce federal regulatory scheme relating to utilities); *Lake Carriers' Ass'n v. Kelley,* 456 U.S. 985 (1982) (mem.) (upholding statute that granted states authority to ban sewage emissions from all vessels), *aff'g* 527 F. Supp. 1114 (E.D. Mich. 1981) (three-judge panel); *Train v. National Resources Defense Council, Inc.,* 421 U.S. 60 (1975) (construing provision of Clean Air Act that gave states authority to devise and enforce plans for achieving congressionally defined national air quality standards).

[52] Some recent opinions of this Office have read *Buckley* more broadly as repudiating the historical understanding of the Appointments Clause and endorsing the proposition we reject here — that is, that all persons exercising significant federal authority, by virtue of that fact alone, must be appointed pursuant to the Appointments Clause. We are aware of four opinions in which our disagreement with this understanding of *Buckley* would cause us to reach a different conclusion on the Appointments Clause question presented. *See Constitutionality of Subsection 4117(b)*

**b. The Exercise of Significant Authority.** Chief Justice Marshall's observation that "[a]lthough an office is 'an employment,' it does not follow that every employment is an office," *United States v. Maurice*, 26 F. Cas. at 1214 points to a second distinction as well — although not one that was at issue in *Maurice* itself. An officer is distinguished from other full-time employees of the federal government by the extent of authority he or she can properly exercise. As the Court expressed this in *Buckley*:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine*, [means] that any appointee exercising *significant authority* pursuant to the laws of the United States . . . must . . . be appointed in the manner prescribed by [the Appointments Clause].

424 U.S. at 125–26 (emphasis added). [53] In contrast, "[e]mployees are lesser functionaries subordinate to officers of the United States." *Id.* at 126 n.162.

The distinction between constitutional officers and other employees is a long-standing one. *See, e.g., Burnap v. United States*, 252 U.S. 512, 516–19 (1920) (landscape architect in the Office of Public Buildings and Grounds was an employee, not an officer); *Second Deputy Comptroller of the Currency—Appointment*, 26 Op. Att'y Gen. at 628 (Deputy Comptroller of the Currency was "manifestly an officer of the United States" rather than an employee). At an early point, the Court noted the importance of this distinction for Appointments Clause analysis. *See Germaine*, 99 U.S. at 509. [54]

---

*of Enrolled Bill H.R. 5835, the "Omnibus Budget Reconciliation Act of 1990,"* 14 Op. O.L.C. 154, 155–56 (1990) (statutory scheme under which congressional delegations and physicians' organizations of certain states exercise "significant authority" violates Appointments Clause); *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 221–24 (1989) (provisions of False Claims Act authorizing *qui tam* suits by private parties violate Appointments Clause because *qui tam* relators exercise "significant governmental power"); *Representation of the United States Sentencing Commission in Litigation*, 12 Op. O.L.C. 18, 26 (1988) (private party acting as counsel for United States agency must be appointed pursuant to Appointments Clause); *Proposed Legislation to Establish the National Indian Gaming Commission*, 11 Op. O.L.C. 73, 74 (1987) (Appointments Clause problems raised where state and local officials given authority to waive federal statute). Our conclusion that the more limited historical understanding of the Appointments Clause is correct requires us to disavow the Appointments Clause holdings of those opinions. To the extent that our current reading of *Buckley* is inconsistent with the Appointments Clause reasoning of other opinions of this office, that reasoning is superseded. *See Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 249 (1989).

[53] *See Appointments in the Department of Commerce and Labor*, 29 Op. Att'y Gen. 116, 118–19, 122–23 (1911) (official authorized to perform all the duties of the Commissioner of Fisheries, who was appointed by the President and confirmed by the Senate, was an officer; scientists, technicians, and superintendent of mechanical plant in the Bureau of Standards were employees rather than officers); *Second Deputy Comptroller of the Currency—Appointment*, 26 Op. Att'y Gen. 627, 628 (1908) ("The officer is distinguished from the employee in the greater importance, dignity, and independence of his position"; official authorized to exercise powers of the Comptroller of the Currency in the absence of the Comptroller was clearly an officer.).

[54] The status of certain officials traditionally appointed in modes identical to those designated by the Appointments Clause is somewhat anomalous. For instance, low-grade military officers have always been appointed by the President and confirmed by the Senate and understood to be "Officers of the United States" in the constitutional sense. In *Weiss v. United States*, 510 U.S. 163, 170 (1994), the Supreme Court recently indicated its agreement with that

Continued

The Supreme Court relied on the officer/employee distinction in its recent decision in *Freytag v. Commissioner*, 501 U.S. 868 (1991). In *Freytag*, the Court rejected the argument that special trial judges of the Tax Court are employees rather than officers because "they lack authority to enter a final decision" and thus arguably are mere subordinates of the regular Tax Court judges. [55] *Id.* at 881. The Court put some weight on the fact that the position of special trial judge, as well as its duties, salary, and mode of appointment, are specifically established by statute; [56] the Court also emphasized that special trial judges "exercise significant discretion" in carrying out various important functions relating to litigation in the Tax Court. *Id.* at 881–82.

Applying the same understanding of the distinction between officers and employees, this Office has concluded that the members of a commission that has purely advisory functions "need not be officers of the United States" because they "possess no enforcement authority or power to bind the Government." *Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 202–03 (1983). For that reason, the creation by Congress of presidential advisory committees composed, in whole or in part, of congressional nominees or even of members of Congress does not raise Appointments Clause concerns.

Since employees do not wield independent discretion and act only at the direction of officers, they do not in their own right "exercis[e] responsibility under the public laws of the Nation," *Buckley*, 424 U.S. at 131. [57] As a constitutional

___

understanding. It is at least arguable, however, that the authority exercised by second lieutenants and ensigns is so limited and subordinate that their analogues in the civil sphere clearly would be employees. There are at least three possible explanations. (1) Congress may make anyone in public service an officer simply by requiring appointment in one of the modes designated by the Appointments Clause. The Clause, on this view, mandates officer status for officials with significant governmental authority but does not restrict the status to such officials. This apparently was the nineteenth-century view. *See, e.g., United States v. Perkins*, 116 U.S. 483, 484 (1886) (Cadet engineer at the Naval Academy was an officer because "Congress has by express enactment vested the appointment of cadet-engineers in the Secretary of the Navy and when thus appointed they become officers and not employees."). While recognizing that Congress may make anyone in the public service an officer, Attorney General Kennedy rejected the argument that Congress evinces and effectuates such an intention merely by providing for the public servant to be appointed by a method that coincidentally conforms with the Appointments Clause. *See Communications Satellite Corporation*, 42 Op. Att'y Gen. 165, 167 (1962) ("[I]t does not follow" from the Constitution that "every appointment authorized by law which is preceded by nomination and confirmation necessarily renders the appointee an officer."). (2) Certain officials are constitutional officers because in the early Republic their positions were of greater relative significance in the federal government than they are today. *Cf. Buckley*, 424 U.S. at 126 (postmasters first class and clerks of district courts are officers). (3) Even the lowest ranking military or naval officer is a potential commander of United States armed forces in combat — and, indeed, is in theory a commander of large military or naval units by presidential direction or in the event of catastrophic casualties among his or her superiors.

[55] In fact, as the Court pointed out, the chief judge of the Tax Court can assign special trial judges to render *final* decisions in certain types of cases, a power that the government conceded rendered them, in those circumstances, "inferior officers who exercise independent authority." The Court rejected the argument that special trial judges could be deemed inferior officers for some purposes and employees for others. *Freytag*, 501 U.S. at 882.

[56] The text of the Appointments Clause implies that offices in the sense of the Clause must be established in the Constitution or by statute. *See* U.S. Const. art. II, §2, cl. 2 (specifying certain officers and then referring to "all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law").

[57] That an employee may not exercise *independent* discretion does not, of course, mean that his or her duties may not encompass responsibilities requiring the exercise of judgment and discretion under the ultimate control and supervision of an officer. In *Steele v. United States* (No. 2), 267 U.S. 505, 508 (1925), the Supreme Court noted that a "deputy marshal is not in the constitutional sense an officer of the United States," yet "is called upon to exercise great responsibility and discretion" in "the enforcement of the peace of the United States, as

matter, therefore, an employee may be selected in whatever manner Congress directs. Conversely, "any appointee" in federal service who "exercis[es] significant authority pursuant to the laws of the United States" must be an officer in the constitutional sense and must be appointed in a manner consistent with the Appointments Clause.[58] *Buckley*, 424 U.S. at 126. Congress and the President may not avoid the strictures of the Clause by vesting federal employees with the independent or discretionary responsibility to perform any "significant governmental duty." *Id.* at 141.[59]

**c. Appointment to a Position of Employment within the Federal Government.** Finally, *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1868), and the other major decisions defining "Officers of the United States" all reflect the historical understanding that a constitutional officer is an individual who is appointed to his or her office by the federal government. The Appointments Clause simply is not implicated when significant authority is devolved upon non-federal actors.[60] In *Hartwell* the Court stated, "[a]n office is a public station, or employment, conferred by the appointment of government. . . . The employment of the defendant was in the public service of the United States." 73 U.S. at 393; *see also United States v. Germaine*, 99 U.S. 508, 510 (1879) (founders intended appointment pursuant to the Appointments Clause only for "persons who can be said to hold an office under the government about to be established under the Constitution"). It is a conceptual confusion to argue that federal laws delegating authority to state officials create federal "offices," which are then filled by (improperly appointed) state officials. Rather, the "public station, or employment" has been created by state law; the federal statute simply adds federal authority to a pre-existing state office. Accordingly, the substantiality of the delegated authority is immaterial to the Appointments Clause conclusion.[61] An analogous point applies

---

that is embraced in the enforcement of federal law." But deputy marshals act at the direction of "the United States marshal under whom they serve," *id.*, who *is* an officer in the constitutional sense.

[58] *See Appointment and Removal of Inspectors of Customs*, 4 Op. Att'y Gen. 162, 164 (1843) (Congress may not provide for the appointment of "any employe[e], coming fairly within the definition of an inferior officer of the government," except by a mode consistent with the Appointments Clause).

[59] *Buckley* illustrates this last point. The FEC commissioners appointed by congressional officials were undoubtedly employees of the federal government but they could not constitutionally exercise the enforcement powers the statute attempted to grant them because their mode of appointment precluded them from being officers. 424 U.S. at 137–41.

[60] The delegation to private persons or non-federal government officials of federal-law authority, sometimes incorrectly analyzed as raising Appointments Clause questions, can raise genuine questions under other constitutional doctrines, such as the non-delegation doctrine and the general separation of powers principle. *Compare Confederated Tribes of Siletz Indians v. United States*, 841 F. Supp. 1479, 1486–89 (D. Or. 1994) (confusing Appointments Clause with separation of powers analysis in holding invalid a delegation to a state governor), *aff'd on other grounds*, 110 F.3d 688 (9th Cir.), *cert. denied*, 522 U.S. 1027 (1997), *with United States v. Ferry County*, 511 F. Supp. 546, 552 (E.D. Wash. 1981) (correctly dismissing Appointments Clause argument and analyzing delegation to county commissioners under non-delegation doctrine).

[61] *See Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir. 1986) ("'[B]ecause the Council members do not serve pursuant to federal law," it is

Continued

to delegations made to private individuals: the simple assignment of some duties under federal law, even significant ones, does not by itself pose an Appointments Clause problem. [62]

In our view, therefore, the lower federal courts have been correct in rejecting Appointments Clause challenges to the exercise of federally derived authority by state officials, [63] the District of Columbia City Council, [64] *qui tam* relators under the False Claims Act, [65] and plaintiffs under the citizen suit provisions of the Clean Water Act. [66] The same conclusion should apply to the members of multinational or international entities who are not appointed to represent the United States. [67] We believe that the Appointments Clause doubts sometimes voiced about

---

"immaterial whether they exercise some significant executive or administrative authority over federal activity."), *cert. denied*, 479 U.S. 1059 (1987).

[62] One might also view delegations to private individuals as raising the same considerations as suggested by the distinction drawn earlier between appointee and independent contractor—so long as the statute does not create such tenure, duration, emoluments and duties as would be associated with a public office, the individual is not the occupant of a constitutional office but is, rather, a private party who has assumed or been delegated some federal responsibilities.

[63] *See, e.g., Seattle Master Builders,* 786 F.2d at 1364–66. The particular state officials at issue were serving on an entity created by an interstate compact established with the consent of Congress, but that fact is not significant for Appointments Clause purposes. The crucial point was that "[t]he appointment, salaries and direction" of the officials were "state-derived": "the states ultimately empower the [officials] to carry out their duties." *Id.* at 1365. The Supreme Court's recent decision in *New York v. United States,* 505 U.S. 144 (1992), which held that Congress cannot "commandeer" state officials to serve federal regulatory purposes, reenforces this conclusion. Where state officials do exercise significant authority under or with respect to federal law, they do so *as state officials,* by the decision and under the ultimate authority of the state.

*Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252 (1991), does not suggest a different conclusion. The constitutional issue in that case was the validity of a statutory provision subjecting the Airports Authority "to the veto power of" a Board of Review composed of members of Congress purportedly "acting 'in their individual capacities.'" *Id.* at 270. The Supreme Court held that the Board in fact acted as an agent of Congress and that the Board's veto power therefore represented an unconstitutional enlargement of congressional authority. *Id.* at 272–77. Nothing in the Court's opinion suggests that there would have been any constitutional problem if Congress had delegated the same power to the Authority subject to review by the executive branch.

[64] *See Techworld Dev. Corp. v. D.C. Preservation League,* 648 F. Supp. 106, 115–17 (D.D.C. 1986).

[65] We believe that *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 757–59 (9th Cir. 1993) (rejecting Appointments Clause challenge to False Claims Act), *cert. denied,* 510 U.S. 1140 (1994), reached the correct result but through an incorrect line of analysis. *See id.* at 758 (Clause not violated because of the relative modesty of the authority exercised by the relator). The better analysis, in our view, is that of the court in *United States ex rel. Burch v. Piqua Engineering, Inc.,* 803 F. Supp. 115 (S.D. Ohio 1992), which held that "because *qui tam* plaintiffs are not officers of the United States, the FCA does not violate the Appointments Clause." *Id.* at 120. We now disapprove the Appointments Clause analysis and conclusion of an earlier opinion of this Office, *Constitutionality of the Qui Tam Provisions of the False Claims Act,* 13 Op. O.L.C. 207 (1989) (arguing that the *qui tam* provisions violate the Clause).

[66] Here the Court phrased its analysis in terms of separation of powers, but the challenge to the statute was, at its core, based on the Appointments Clause. *See Chesapeake Bay Found. v. Bethlehem Steel Corp.,* 652 F. Supp. 620, 624 (D. Md. 1987) (*Buckley v. Valeo,* 424 U.S. 1 (1976) (per curiam), "does not stand for the proposition . . . that private persons may not enforce any federal laws simply because they are not Officers of the United States appointed in accordance with Article II of the Constitution.").

[67] At least where these entities are created on an ad hoc or temporary basis, there is a long historical pedigree for the argument that even the United States representatives need not be appointed in accordance with Article II. *See, e.g.,* Alexander Hamilton, *The Defence* No. 37 (Jan. 6, 1796), *reprinted in* 20 *The Papers of Alexander Hamilton* 13, 20 (Harold C. Syrett ed., 1974):

> As to what respects the Commissioners agreed to be appointed [under the Jay Treaty with Great Britain], they are not in a strict sense OFFICERS. They are *arbitrators* between the two Countries. Though in the Constitutions, both of the U[nited] States and of most of the Individual states, a particular mode of

legislation requiring the concurrence of state or local officials, Indian tribes, or private persons as a condition precedent to federal action are equally without merit. [68]

Determining whether an individual occupies a position of private employment or federal employment can pose difficult questions. The Supreme Court recently set forth rules for making this determination in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995). There, the Court found itself faced with the question of whether Amtrak is a private corporation or an agency of the government. Amtrak is chartered by Congress and incorporated under the District of Columbia Business Corporation Act. *Id.* at 383–85. The organic statute expressly provides that Amtrak "shall be operated and managed as a for-profit corporation, and is not a department, agency, or instrumentality of the United States Government." 49 U.S.C. § 24301(a)(2)–(3). The Court ruled that this provision "is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress' control . . . . But it is not for Congress to make the final determination of Amtrak's status as a government entity for purposes of determining the constitutional rights of citizens affected by its actions." 513 U.S. at 392.

However, the Court held that an entity is "what the Constitution regards as the Government," if the entity is government-created and government-controlled. *Id.* Because Amtrak was created "by special law, for the furtherance of governmental objectives," it is government-created. [69] *Id.* at 400. Because federally appointed members of Amtrak's governing board hold "voting control" and there is no provision for this government control to sunset, Amtrak is government-controlled. *See id.* at 399–400. The Court contrasted Conrail, which it determined is not what the Constitution regards as the government. By statute the federal government appoints a voting majority of Conrail's board of directors. Nevertheless, the Court held that Conrail is not part of the government, because the government's voting control will shift to the private shareholders if Conrail's debt to the federal government falls below half of its total indebtedness and because " '[t]he responsibilities of the federal directors are not different from those of the other directors — to operate Conrail at a profit for the benefit of its shareholders' — which contrasts with the public-interest 'goals' set forth in Amtrak's

---

appointing officers is designated, yet in practice it has not been deemed a violation of the provision to appoint Commissioners or special Agents for special purposes in a different mode.

The traditional view of the Attorneys General has been that the members of international commissions hold "an office or employment emanating from the general treaty-making power, and created by it and" the foreign nation(s) involved and that members are not constitutional officers. *Office—Compensation*, 22 Op. Att'y Gen. 184, 186 (1898).

[68] Some of our prior opinions express such concerns. Because that view, we now conclude, cannot be reconciled with Appointments Clause principles or caselaw, we expressly disavow it.

[69] The Court also referred to this as a "policy-implementing" role. *Id.* at 396. This is to distinguish government agencies and instrumentalities, such as Amtrak, from truly private corporations that, though created pursuant to statutory authority, do not implement any government policy, but instead pursue profit and the policies of their shareholders.

charter." *Id.* at 399 (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974)). [70]

**d. Summary.** An appointee (1) to a position of employment (2) within the federal government (3) that carries significant authority pursuant to the laws of the United States is required to be an "Officer of the United States." Each of these three conditions is independent, and all three must be met in order for the position to be subject to the requirements of the Appointments Clause.

We recently applied this principle in determining whether the Appointments Clause represents a blanket proscription against participation by the federal government in binding arbitration. Typically, arbitrators are private individuals chosen by the parties to the dispute. In a binding arbitration, the decision of the arbitrators is mandatory upon the parties, subject only to limited judicial review. The view that the Appointments Clause prohibits federal government participation in binding arbitration proceeds from the misinterpretation of *Buckley* discussed above. We reasoned that although it is "beyond dispute that arbitrators exercise significant authority, at least in the context of binding arbitration involving the federal government,"[71] the standard binding arbitration mechanism does not implicate the Appointments Clause. Arbitrators

> are manifestly private actors who are, at most, independent contractors to, rather than employees of, the federal government. Arbitrators are retained for a single matter, their service expires at the resolution of that matter, and they fix their own compensation.

---

[70] In some passages, the Court spoke in terms of the First Amendment and individual rights, for instance:

We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.

*Id.* at 400. We do not, however, believe that the Court meant to imply that it is within Congress's power to exempt federal instrumentalities from the Constitution's structural requirements, such as the Appointments Clause and the separation of powers doctrine, that apply to all other federal agencies. We believe instead that the references to individual rights are explained by two considerations. First, the issue in the case was whether Amtrak had violated the petitioner's First Amendment rights, and so did not raise any structural issues. Second, the Constitution imposes certain obligations on all government entities, state as well as federal. In other words, not all government entities, within *Lebron*'s definition, are part of the *federal* government; many are part of a state or local government or of an interstate compact. *See id.* at 397 (citing *Pennsylvania v. Board of Directors of City Trusts*, 353 U.S. 230 (1957) (per curiam)). These latter entities are not subject to the separation of powers doctrine or the Appointments Clause. Because the Court was concerned with all entities that the Constitution regards as within the government, not just the federal government, it naturally phrased its opinion in terms of the obligations that apply to all organs of government, not just the organs of the federal government. Ultimately, we can conceive of no principled basis for distinguishing between the status of a federal entity vis-a-vis constitutional obligations relating to individual rights and vis-a-vis the structural obligations that the Constitution imposes on federal entities. *See* Brief of Appellant United States, *Wilkinson v. Legal Servs. Corp.*, 80 F.3d 535 (D.C. Cir. 1996) (Nos. 95–5144, 91–5174). It therefore is not surprising that the Court did not consistently limit its language to individual rights. *See, e.g., Lebron*, 513 U.S. at 397 ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."). Thus, we do not believe that Congress may evade the "solemn obligations" of the doctrine of separation of powers by resorting to the corporate form any more than it may evade the obligations of the Bill of Rights through this artifice.

[71] *Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 Op. O.L.C. 208, 216 (1995).

> Hence, their service does not bear the hallmarks of a constitutional office — tenure, duration, emoluments, and continuing duties. Consequently, arbitrators do not occupy a position of employment within the federal government, and it cannot be said that they are officers of the United States. Because arbitrators are not officers, the Appointments Clause does not place any requirements or restrictions on the manner in which they are chosen.

19 Op. O.L.C. at 216. [72] The only case that to our knowledge addresses this question agreed with our analysis and conclusion, and held that the Appointments Clause does not prohibit the federal government from entering into binding arbitration. *See Tenaska Wash. Partners v. United States*, 34 F. Cl. 434, 440 (1995) ("[T]he OLC Memorandum is a thorough and persuasive analysis.").

**2. Who May Be an Inferior Officer?** Since all officers of the United States *may* be appointed by the President with the advice and consent of the Senate, the only Appointments Clause significance to the distinction between principal and inferior officers lies in Congress's ability to provide for the appointment of inferior officers by one of the alternative means listed in the Clause. The Supreme Court has observed that "[t]he line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn." *Morrison v. Olson*, 487 U.S. 654, 671 (1988). Unfortunately, the Court's own decisions provide only modest additional guidance. In *Morrison*, the Court declined to "attempt . . . to decide exactly where the line falls" because it found that the independent counsel "clearly falls on the 'inferior officer' side of that line." *Id.* at 671. The Court advanced several factors that pointed to that conclusion: (1) The counsel was removable by the Attorney General, thus making counsel "to some degree 'inferior' in rank and authority." *Id.* (2) The counsel's duties were limited, particularly with respect to policy making and administration. (3) The counsel's tenure was limited to the particular "mission that

---

[72] We nevertheless noted that it is possible for a theoretical binding arbitration mechanism to run afoul of the Appointments Clause. As indicated, arbitrators whose sole or collective decisions are binding on the government exercise significant authority. If any such arbitrator were to occupy a position of employment within the federal government, that arbitrator would be required to be appointed in conformity with the Appointments Clause. *See Freytag v. Commissioner*, 501 U.S. 868, 881 (1991). Thus, if a federal agency were to conduct binding arbitrations and to employ arbitrators with whom it provided all relevant attributes of an office, all such arbitrators would be required to be appointed in conformity with the Appointments Clause. *See* 19 Op. O.L.C. at 216.

she was appointed for." *Id.* at 672. [73] The Court's other recent Appointments Clause decisions shed little additional light on the subject. [74]

We agree with the court of appeals in *Silver v. United States Postal Service*, 951 F.2d 1033 (9th Cir. 1991), that the particular factors *Morrison* discussed do not constitute an exhaustive or exclusive list. *See id.* at 1040 ("The nature of each government position must be assessed on its own merits."). The *Silver* court noted that the official at issue in that case, the Postmaster General, "performs many tasks and has many responsibilities," but determined the office to be an inferior one because the Postmaster General "does not have 'control' " and "serv[es] at the pleasure of the" Board of Governors of the Postal Service. *Id.* This approach is consistent with the one we have taken in the past. For example, in concluding that United States Attorneys are inferior officers whose appointment could be vested in the Attorney General, we rejected the argument that the constitutional term "inferior" means " 'petty or unimportant' "; instead, we concluded that the term connotes amenability to supervision by the superior "in whom the power of appointment is vested." *United States Attorneys—Suggested Appointment Power of the Attorney General—Constitutional Law (Article 2, §2, cl. 2)*, 2 Op. O.L.C. 58, 58–59 (1978) (quoting *Collins v. United States*, 14 Ct. Cl. 568, 574 (1878)); *see also Department of Housing and Urban Development—Delegations of Authority—42 U.S.C. §3533, 3535*, 2 Op. O.L.C. 87, 89 (1978) (deputy assistant secretary, who is subject to direction by an assistant secretary, is "unquestionably" an inferior officer). In determining whether an officer may properly be characterized as inferior, we believe that the most important issues are the extent of the officer's discretion to make autonomous policy choices and the location of the powers to supervise and to remove the officer. While an officer responsible only to the President for the exercise of significant discretion in decision making is probably a principal officer, an officer who is subject to control and removal by an officer other than the President should be deemed presumptively inferior.

---

[73] The Court also compared the independent counsel's status to that of other officials who had been considered inferior officers in earlier decisions. *See* 487 U.S. at 672–73 (discussing cases dealing with vice-consuls, election supervisors, and United States commissioners). The Court also took note of its "reference in *United States v. Nixon*, 418 U.S. 683, 694, 696 (1974), to the Office of Watergate Special Prosecutor—whose authority was similar to that of [the independent counsel]—as a 'subordinate officer' " and concluded that this characterization was "consistent" with its conclusion that independent counsels are inferior officers. *See* 487 U.S. at 673.

[74] *Buckley* simply asserted that the members of the FEC were "at the very least" inferior officers. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). In *Freytag*, no one claimed that the special trial judges at issue were principal, as opposed to inferior, officers; instead, the case involved the distinction between inferior officers and employees. *Freytag v. Commissioner*, 501 U.S. 868, 880–82 (1991). The military judges under review in *Weiss*, like all commissioned officers in the armed forces, were appointed with the advice and consent of the Senate. *Weiss v. United States*, 510 U.S. 163, 170 (1994). Justice Souter concurred in the Court's opinion on the understanding that the military judges at issue there are inferior officers. *Id.* at 182 (Souter, J., concurring). He reasoned that there were substantial points to be made on either side of the question whether they were principal or inferior officers and concluded that the Court should defer "to the political branches' [implicit] judgment" that the military judges were inferior officers. *Id.* at 194. Although Justice Souter's admonition that "it is ultimately hard to say with any certainty on which side of the line" between principal and inferior status a given officer may fall, *id.* at 193, is indubitably correct, the executive branch cannot invoke the principle of judicial deference he properly used to decide the issue in *Weiss*.

**3. Who May Appoint Inferior Officers?** The Appointments Clause does not define "Heads of Departments" or "Courts of Law," and questions have arisen about which entities are included by these terms within the "possible repositories for the appointment power." *Freytag v. Commissioner*, 501 U.S. 868, 884 (1991). Earlier Attorneys General have accorded these terms a broad construction. *See, e.g., Authority of Civil Service Commission to Appoint a Chief Examiner*, 37 Op. Att'y Gen. 227 (1933). The same is true of the courts, [75] which have held that the Tax Court, [76] a special division of a court of appeals created primarily for the purpose of appointing independent counsels, [77] and the Governors of the Postal Service (as a collective head of department), [78] can be vested with appointments power. The interpretive difficulties lie in determining exactly how broadly the term "Department" should be read.

We think that the "Departments" to which the Appointments Clause refers are not limited to those major divisions of the executive branch that are headed by members of the President's cabinet. [79] In 1933, Acting Attorney General Biggs opined that Congress could authorize the Civil Service Commission to appoint an inferior officer. *Authority of Civil Service Commission to Appoint a Chief Examiner*, 37 Op. Att'y Gen. 227 (1933). His opinion noted that the Commission "ha[d] certain independent executive duties to perform," was "responsible only to the Chief Executive," *id.* at 229, and was "not a subordinate Commission attached to one of the so-called executive departments," *id.* at 231. As "an independent division of the Executive Branch," he concluded, the Commission was a "Department" for Appointments Clause purposes and its three commissioners, collectively, "the 'head of a Department' in the constitutional sense." *Id.* The fact that the commissioners were not members of the Cabinet was not controlling,

---

[75] The exception to this broad reading of the Clause was *Buckley*'s unsurprising conclusion that "neither Congress nor its officers [are] included within the language 'Heads of Departments.'" *Buckley v. Valeo*, 424 U.S. 1, 127 (1976) (per curiam).

[76] *Freytag*, 501 U.S. at 892. The Court in *Freytag* concluded that it is constitutional for the chief judge of the Tax Court to appoint special trial judges because the Tax Court, though an Article I legislative court, "exercise[s] judicial power and perform[s] exclusively judicial functions" and thus is a "Court[] of Law" within the meaning of the Clause. *Id.* Justice Scalia argued in a concurring opinion that the Tax Court should be treated as a "Department" and the chief judge as its "Head." *Id.* at 914–22 (Scalia, J., concurring in part and concurring in the judgment). Justice Souter recently has suggested that the opinion of the Court in *Freytag* did not actually resolve the question of whether the judges of the Tax Court, including the chief judge, are principal officers. *Weiss v. United States*, 510 U.S. 163, 192 (1994) (Souter, J., concurring).

[77] *Morrison v. Olson*, 487 U.S. 654 (1988). In *Morrison*, the Court indicated that there is some "constitutional limitation on 'incongruous' interbranch appointments," *id.* at 677, despite the broad language the Appointments Clause uses in describing Congress's discretion on the subject. A statute vesting in a court the power to appoint officers acting in areas in which judges "have no special knowledge or expertise," *id.* at 676 n.13, for example, might create tension between the court's normal functions and "the performance of [its] duty to appoint." *Id.* at 676. We think that this limitation is probably of little practical significance with respect to *presidential* appointments in light of the fact that it is difficult to conceive a plausible argument that vesting the power in the President to appoint *any* officer (other, perhaps, than some legislative officers) could ever be constitutionally "incongruous."

[78] *Silver v. United States Postal Serv.*, 951 F.2d 1033, 1038 (9th Cir. 1991).

[79] The Appointments Clause thus differs from Section 4 of the Twenty-fifth Amendment, the language and history of which confirm that the "principal officers of the executive departments" it mentions are the members of the Cabinet. U.S. Const. amend. XXV, § 4; *see Freytag*, 501 U.S. at 886–87; *id.* at 917 (Scalia, J., concurring in part and concurring in the judgment).

the Acting Attorney General concluded, because the Cabinet itself is not a creation of the Constitution. *Id.* [80] We find this opinion persuasive and note that the Court's opinion in *Freytag* ultimately reserved the question of whether the heads of entities other than cabinet-level departments can be vested with the power to appoint inferior officers. *See Freytag*, 501 U.S. at 887 n.4.[81] *Cf. United States v. Germaine*, 99 U.S. 508 (1879) (Commissioner of Pensions, as head of a bureau within the Interior Department, was not a "Head of Department").[82]

We would apply the reasoning of the 1933 opinion in concluding that it is constitutional for Congress to vest the power to appoint inferior officers in the heads of the so-called independent agencies — those agencies whose heads are not subject to removal at will by the President and that conventionally are understood to be substantially free of policy direction by the President. Except for the attenuated nature of the President's supervisory authority, most of the independent agencies are clearly analogous to major executive agencies. They exercise governmental authority without being subordinated to any broader unit within the executive branch, and Congress has implicitly characterized them as "Departments" for Appointments Clause purposes by permitting their heads to appoint officials

[80] "The Cabinet, as such, was not provided for by the Constitution and it follows therefore that the interpretation of the Constitution cannot depend upon such consideration." 37 Op. Att'y Gen. at 231; *accord Freytag*, 501 U.S. at 916–17 (Scalia, J., concurring in part and concurring in the judgment).

[81] While the opinion of the Court in *Freytag* rejected the argument that "every part of the Executive Branch is a department," 501 U.S. at 885, we do not think that the Court's reasoning is inconsistent with the 1933 Justice Department opinion. The Court's chief concern was that part of the Appointments Clause's purpose is to prevent "the dangers posed by an excessively diffuse appointment power." *Id.* The Court observed that "[g]iven the inexorable presence of the administrative state, a holding that every organ in the Executive Branch is a department would multiply indefinitely the number of actors eligible to appoint." *Id.* We do not think that our view that entities other than cabinet-level agencies can be "Departments" for the purposes of the Appointments Clause leads to this constitutionally troublesome result. We assume the continuing validity of *United States v. Germaine*, 99 U.S. 508 (1879), which held that the head of a bureau within an executive branch department was not the head of a department. Most of the discrete units of the executive branch in fact are subordinate to some larger executive agency, and therefore are not departments under *Germaine*. The Federal Bureau of Investigation, for example, wields far-reaching law enforcement authority, but as a component of the Justice Department it is not itself a "Department" for purposes of the Appointments Clause. Legislation authorizing the appointment of inferior officers by a subordinate officer within a department with the approval of the head of the department, *see United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 392–94 (1868); *see also Germaine*, 99 U.S. at 511 (explaining *Hartwell*), does not transgress this principle because for constitutional purposes the appointment should be deemed to be made by the department head. We also note that the four concurring Justices in *Freytag* expressly adopted the reading of the Appointments Clause set forth in the 1933 Attorney General's opinion: that "the term 'Departments' means all independent executive establishments." 501 U.S. at 919 (Scalia, O'Connor, Kennedy, & Souter, JJ., concurring in part and concurring in the judgment).

[82] The court of appeals in *Silver* found no constitutional problem with a statute vesting the power to appoint an inferior officer, the Deputy Postmaster General, in an entity consisting of the Governors of the Postal Service (principal officers who are collectively the "head of a Department") and the Postmaster General (an inferior officer appointed by the Governors). *See* 951 F.2d at 1036–41. This conclusion might be justified on either of two rationales. (1) As Justice Souter recently noted, it remains unresolved whether "the Appointments Clause envisions appointment of some inferior officers by other inferior officers," *Weiss v. United States*, 510 U.S. 163, 192–93 (1994) (Souter, J., concurring), and it may be that there is no constitutional objection to designating one or more inferior officers to be the head of a department with the power to make appointments. (2) It might be argued that although as a general matter the head of a department must be a principal officer and a collective head of department must consist of exclusively principal officers, the association of an inferior officer with a collective head of department in making a specific appointment is constitutionally harmless.

who plainly are inferior officers. [83] Nothing in the original history of the Clause suggests any intention to exclude from the scope of the Clause separate establishments that are not subject to plenary presidential control. [84] Finally, in reserving the question of appointments by "the head of one of the principal agencies," the *Freytag* Court itself included as examples of those agencies the "independent" FTC and the SEC as well as the clearly executive CIA, which suggests that the Court did not perceive a difference between the two types of agencies, at least in the Appointments Clause context. 501 U.S. at 887 n.4. We see no reason to exclude the independent regulatory agencies from the class of entities that are "Departments" for Appointments Clause purposes.

We note that, even accepting the reasoning of the 1933 Justice Department opinion, some entities may exercise governmental authority in so limited a manner that they need not be viewed as "Departments" even though their heads are responsible only to the President. For example, the Committee for Purchase from People Who Are Blind or Severely Disabled, the members of which are appointed by the President alone, 41 U.S.C. § 46(a), appears to exercise significant authority but is subordinate to no larger executive agency. *Id.* §§ 46–48c. Given the narrow scope of the Committee's powers, however, we do not think that the Committee necessarily should be analyzed as a collective head of a department for Appointments Clause purposes.

**4. Legislation Lengthening the Tenure of an Officer.** As the Court held in *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam), the Appointments Clause by its terms and its structure prohibits Congress from itself exercising the power to appoint "Officers of the United States." The text and structure of the Clause reflect a deliberate constitutional choice to deny to the legislature the power to select the individuals who exercise significant governing authority as non-legislative officers of the federal government. *See id.* at 129–31 (reviewing the debates in the Philadelphia convention). [85] This choice to exclude Congress as such from

---

[83] *See Freytag,* 501 U.S. at 918 (Scalia, J., concurring in part and concurring in the judgment) (noting that most inferior officers in independent agencies are appointed by neither the President nor a Cabinet official).

[84] In late-eighteenth century English, the term "department" had no specialized governmental or organizational meaning. For example, Dr. Johnson defined "department" as "[s]eparate allotment; province or business assigned to a particular person," 1 Samuel Johnson, *A Dictionary of the English Language* (1755), to which Webster added the gloss "in which a class of duties are allotted to a particular person." 1 Noah Webster, *American Dictionary* 58 (1828), *quoted in Freytag,* 501 U.S. at 920 (Scalia, J., concurring in part and concurring in the judgment) (founders chose "Department" to connote "separate organization"). In its foundational legislation, the First Congress used the word both for the Departments of Foreign Affairs (later, State) and War and for the Department of the Treasury, even though it pointedly did not term Treasury an "executive department" as it did State and War. *Compare* Act of July 27, 1789, ch. 4, 1 Stat. 28, 28–29 (establishing the Department of Foreign Affairs) *and* Act of Aug. 7, 1789, ch. 7, 1 Stat. 49, 49–50 (establishing the Department of War) *with* Act of Sept. 2, 1789, ch. 12, 1 Stat. 65, 65–67 (establishing the Department of the Treasury). A substantial body of scholarship views this terminological choice as reflecting an intention to make Treasury at least partially independent of the President, although by means other than limiting the latter's removal power. *See* Lessig & Sunstein, *supra* note 33, at 27–29; Casper, *supra* note 33, at 240–42; Shane, *supra* note 33, at 615–16.

[85] *Buckley* noted that the Constitution expressly authorizes the selection of the Speaker of the House and the President *pro tempore* of the Senate from among the membership of those bodies, *see* U.S. Const. art. I, § 2, cl.

Continued

153

the appointments process can be set at naught by means other than legislation overtly vesting in Congress the power of appointment. Accordingly, the executive branch has traditionally viewed statutes that constitute an effective exercise by Congress of the power to appoint as violations of the Appointments Clause.

This issue sometimes arises in connection with statutes that attempt to extend the tenure of an officer with a set term, thus potentially denying the President the power he or she would otherwise have to reappoint the officer or select someone else. In 1951, for example, the President requested the Justice Department's views on the validity of a statute extending the terms of the members of a commission. *See Displaced Persons Commission—Terms of Members*, 41 Op. Att'y Gen. 88 (1951). According to the original legislation creating the commission, the terms were to expire in June 1951, but prior to that date Congress amended the legislation to extend the commissioners' tenure to August 1952. Acting Attorney General Perlman advised the President that, while he did not think "there can be any question as to the power of the Congress to extend the terms of offices which it has created," this legislative power is subject "to the President's constitutional power of appointment and removal." *Id.* at 90. However, because the legislation did not attempt to restrict the President's authority to remove the commissioners at will, it was constitutionally harmless: the President remained free to exercise his appointment power simply by removing the incumbents from office at any time. *See id.* ("As so construed, the [extension legislation] presents no constitutional difficulties."); *see also Pension Agents and Agencies*, 14 Op. Att'y Gen. 147, 148–49 (1872) (discussing President's power to remove officer serving a term extended by statute).[86]

We think that the Department's 1951 opinion adopted the correct approach to this issue: while the power to lengthen the tenure of an incumbent officer is incident to Congress's general power to create, determine the duties of, and abolish offices,[87] that power cannot legitimately be employed to produce a result that is, practically speaking, a congressional reappointment to office. On this reasoning, the extension of tenure of officers serving at will raises no Appointments Clause problem, but lengthening the term of an officer who may be removed only for

5; *id.* art. I, § 3, cl. 5, and held that nothing in the Constitution forbids Congress from appointing non-members as legislative branch officials to "perform duties . . . in aid of those functions that Congress may carry out by itself." 424 U.S. at 127–28, 139.

[86] In this circumstance, Congress's action in lengthening an officer's term does not have the effect of usurping the power of appointment the Constitution vests in the President rather than in Congress. *Cf. In re Benny*, 812 F.2d 1133, 1142–43 (9th Cir. 1987) (Norris, J., concurring in the judgment):

> [T]he Appointments Clause precludes Congress from extending the terms of incumbent officeholders. I am simply unable to see any principled distinction between congressional extensions of the terms of the incumbents and more traditional forms of congressional appointments. Both implicate the identical constitutional evil—congressional selection of the individuals filling nonlegislative offices.

[87] *See Crenshaw v. United States*, 134 U.S. 99 (1890), *Civil Service Retirement Act—Postmasters—Automatic Separation from the Service*, 35 Op. Att'y Gen. 309, 314 (1927) ("If, as stated in [*Embry v. United States*, 100 U.S. 680, 685 (1879),] Congress may at any time add to or take from compensation fixed, it may also, it would seem, by analogy, at any time shorten or lengthen a term of office.").

cause would be constitutionally questionable.[88] However, this conclusion, which we think sound in principle, has been rejected by the courts in at least one context. The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333 (codified as amended in scattered sections of 28 U.S.C.), extended the tenure of bankruptcy judges, who can be removed only for cause, and that provision has been sustained repeatedly against constitutional challenge. The leading case, *In re Benny*, 812 F.2d 1133 (9th Cir. 1987), held that a statutory extension of tenure "becomes similar to an appointment" *only* "when it extends the office for a very long time." *Id.* at 1141; *see also In re Investment Bankers, Inc.*, 4 F.3d 1556, 1562 (10th Cir. 1993) (agreeing with *Benny* and noting that the contrary Appointments Clause argument "has been rejected by every court that has considered it"), *cert. denied*, 510 U.S. 1114 (1994). We do not find especially persuasive the reasoning of *Benny*,[89] and it is possible that the doctrine of *Benny* is limited to its factual context.[90] However, the reasoning set forth in *Benny* and the cases that follow it is susceptible to general application, and it is unclear that the courts could repudiate *Benny*'s conclusion with respect to other officers without undercutting the legitimacy of those cases.

The relevant precedents contemplate a continuum. At the one end is constitutionally harmless legislation that extends the term of an officer who is subject to removal at will. At the other end is legislation, constitutionally objectionable even under *Benny*, that enacts a lengthy extension to a term of office from which

---

[88] In 1987, this Office issued an opinion that may be read to hold that legislation extending the term of any officer, even one serving at the pleasure of the President, is unconstitutional. *See Reappointment of United States Parole Commissioners*, 11 Op. O.L.C. 135 (1987) At the time it was issued, that opinion was directly contrary to long-standing executive branch precedent. *See, e.g., Displaced Persons Commission—Terms of Members*, 41 Op. Att'y Gen. at 90–91. We recently revisited the question presented in the 1987 opinion and concluded that it was in error. *See Constitutionality of Legislation Extending the Terms of Office of United States Parole Commissioners*, 18 Op. O.L.C. 166 (1994). We therefore reaffirmed the traditional view that legislation extending the term of an officer subject to removal at will does not violate the Appointments Clause and disavowed our 1987 suggestion to the contrary.

[89] *Benny* asserted that *Wiener v. United States*, 357 U.S. 349 (1958), implicitly rejected any Appointments Clause argument against term-extension legislation. 812 F.2d at 1141. We think that this overstates *Wiener*. *Wiener* dealt only with the President's removal power and did not consider any issue regarding the Appointments Clause. The date on which the President removed the plaintiff in *Wiener* from office was in fact *within* the term of office for which the plaintiff was originally appointed, although part of the backpay the plaintiff ultimately recovered was for a period after his original term would have expired. *See* 357 U.S. at 350–51 (term should have expired on March 1, 1954 as the law stood at the time plaintiff was appointed; President removed plaintiff on December 10, 1953; plaintiff recovered backpay for four months after March 1, 1954, because commission's authorization was extended after his appointment). The additional Supreme Court cases that *Benny* and other opinions have cited are distinguishable. *See, e.g., Benny*, 812 F.2d at 1141 (citing *Shoemaker v. United States*, 147 U.S. 282 (1893), which upheld legislation imposing additional duties on an officer); *In re Tom Carter Enters.*, 44 B.R. 605, 607 (C.D. Cal. 1984) (citing *Shoemaker* and cases dealing with issues under the Contracts Clause and the Philippine Organic Act). *Benny* also pointed out that the First Congress twice extended the tenure of the first Postmaster General. 812 F.2d at 1142. While we agree that this fact supports the argument that Congress generally possesses the power to extend terms, the original Postmaster General served at the pleasure of the President, and thus the First Congress's actions placed no practical limitation on the appointments power.

[90] The result reached in the *Benny* line of cases was as a practical matter much less troublesome than its reverse, which would have put in question an enormous number of decisions within the bankruptcy system. It is therefore possible to characterize these decisions as a sensible resolution of a legal quandary, which may have compromised constitutional logic but did so at no real cost to the ultimate purposes of the Constitution. However, while this view of the cases may be quite sensible from a political-science perspective, it leaves the constitutional law on the subject in some disarray.

155

the incumbent may be removed only for cause. Legislation along this continuum must be addressed with a functional analysis. Such legislation does not represent a formal appointment by Congress and, absent a usurpation of the President's appointing authority, such legislation falls within Congress's acknowledged authority — incidental to its power to create, define, and abolish offices — to extend the term of an office. As indicated, constitutional harm follows only from legislation that has the practical effect of frustrating the President's appointing authority or amounts to a congressional appointment.

Our recent opinion on legislation extending the terms of members of the United States Sentencing Commission is illustrative of this functional approach. After the Sentencing Commission had been appointed, Congress enacted legislation "to provide [that] a member of the United States Sentencing Commission may continue to serve until a successor is appointed or until the expiration of the next session of Congress." Act of Aug. 26, 1992, Pub. L. No. 102–349, 106 Stat. 933. Commissioners may be removed only for cause. 28 U.S.C. § 991(a). We concluded that the statute did not function to violate the President's appointment power. *See Whether Members of the Sentencing Commission Who Were Appointed Prior to the Enactment of a Holdover Statute May Exercise Holdover Rights Pursuant to the Statute*, 18 Op. O.L.C. 33 (1994). The statute left the President free to "nominate whomever he want[ed] at precisely the same time as he could before [the statute was enacted]." *Id.* at 42. We noted that the effect of the legislation could actually be to augment the President's power by giving him "the option of retaining the holdover officer until he chooses to nominate a successor." *Id.*

We acknowledged the argument that the statute might give Congress the opportunity to appoint, in effect, an incumbent to a new term because the President's removal authority is statutorily restricted and the Senate might refuse to confirm any presidential nominee in order to retain a congressionally favored incumbent. *Id.* But this argument was unavailing for two reasons. First, the argument is unduly speculative insofar as it hypothesizes contumacious conduct on the part of the Congress, and whatever danger such a possibility might entail was mitigated by the limitation on the period for which a holdover may continue to serve. Second, we noted that the holdover provision is unarguably valid as applied to Sentencing Commissioners who took office after the statute's enactment. We concluded that "[i]t is simply not persuasive to argue that the President's appointment power is effectively frustrated when incumbent commissioners hold over but not when subsequent commissioners hold over." *Id.*

We also found it significant that the holdover statute was neutral in its application. We reserved the question of whether a holdover statute "might amount to a prohibited congressional designation, even if the holdover period is for a short time," if the statute "would create or repeal holdover provisions for selective members of the same commission or for classes of members on the same commis-

sion, e.g., those appointed on a certain date or those from a particular political party." *Id.* at 46 n.8.

**5. Legislation Imposing Additional Duties on an Officer.** The executive branch has consistently maintained that a statute creating a new office and conferring it and its duties on the incumbent of an existing office would be unconstitutional under the Appointments Clause. [91] Congress's recognized authority to alter the duties and powers of existing offices could be employed to achieve substantially the same result if the legislature were unconstrained in the duties it could add to an office. [92] The Supreme Court accordingly has interpreted the Constitution to limit the legislature's discretion. The leading case, *Shoemaker v. United States*, 147 U.S. 282 (1893), concerned a statute that created a commission to select the land for Rock Creek Park in the District of Columbia. Three of the five members were to be appointed by the President and confirmed by the Senate; the persons holding two existing federal offices, the chief of engineers of the Army and the engineer commissioner of the District, were declared members ex officio. The Court rejected an Appointments Clause challenge to the assignment of the two engineers to the new commission:

> [W]e do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed.

*Id.* at 301. The legislation at issue was valid, the Court concluded, because the new duties assigned to the engineers "cannot fairly be said to have been dissimilar to, or outside of the sphere of," the engineers' existing responsibilities. *Id.*

---

[91] *See, e.g.,* President Buchanan's signing statement dated June 25, 1860, relating to the Civil Appropriations Act for fiscal year 1861, *in* 5 James D. Richardson, *Messages and Papers of the Presidents, 1789–1897,* at 597–98 (1897) (construing Act to avoid the constitutional problem).

[92] The same possibility is not presented by Congress's power to reduce or limit the duties of an officer. Except with respect to (certain) constitutional officers, Congress has plenary authority to eliminate offices altogether, subject to the general separation of powers principle. The lesser-included power to take away part of an officer's authority does not in itself enable Congress to choose which individual will exercise authority and thus does not implicate the Appointments Clause. *Cf. United States v. San Jacinto Tin Co.,* 125 U.S. 273, 284 (1888) (Congress, as "the legislative body which created the office" of Attorney General, has the authority to put "restrictions . . . upon the exercise of [the Attorney General's] authority").

In *Crenshaw v. United States,* 134 U.S. 99 (1890), the Supreme Court upheld a statute that affected undergraduates ("cadet midshipmen") at the Naval Academy by redesignating them as "naval cadets" and restricting the circumstances in which they would be commissioned upon graduation. The Court concluded that "Congress did not thereby undertake to name the incumbent of any office. It simply changed the name, and modified the scope of the duties." *Id.* at 109.

The *Shoemaker* rule ensures ''that Congress [is] not circumventing the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office.'' *Weiss v. United States*, 510 U.S. 163, 174 (1994). For the imposition of new duties on an officer to be valid under *Shoemaker*, two requirements must be met. First, as in *Shoemaker* itself, the legislation must confer new duties on ''*offices, . . .* [not] on any particular *officer.*'' *Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1192 (D.D.C.), *appeal dismissed as moot*, 903 F.2d 837 (D.C. Cir. 1990). ''Had the Chief of Engineers of the United States Army or the Engineer Commissioner of the District of Columbia resigned from office after the commission was established, he would no longer have served on the commission — the new Chief of Engineers or Engineer Commissioner would have taken over those duties.'' *Id.* at 1192–93 (discussing facts in *Shoemaker*). The statute at issue in *Olympic Federal*, in contrast, abolished certain offices (the three-person Federal Home Loan Bank Board) while simultaneously defining the duties of a new office (the Director of Office of Thrift Supervision (''OTS'')) *and* designating as the first Director the holder of one of the abolished offices (the chair of the Federal Home Loan Bank Board). *See id.* at 1186. The *Olympic Federal* court correctly determined that by doing so the statute in effect appointed the particular individual who was chair of the old board to a new position. *Id.* at 1193. [93]

The second facet of the *Shoemaker* rule is the requirement that the new duties be ''germane to the offices already held by'' the affected officers. 147 U.S. at 301. This inquiry is necessarily case-specific. In *Weiss*, the Court examined closely the specific duties of military judges and the general responsibilities of military and naval officers and concluded that they are so intertwined that the selection by the Judges Advocate General of certain military and naval officers to serve for a time as military judges is consistent with the germaneness requirement. 510 U.S. at 174–76. In giving advice on this issue, we also have looked at the reasonableness of assigning the new duties ''in terms of efficiency and institutional continuity,'' and we have asked whether ''it could be said that [the officers'] functions . . . [with the additional duties] were within the contemplation of those who were in the first place responsible for their appointment and confirmation.'' 4B Op. O.L.C. at 541.

The *Weiss* decision may have weakened judicial enforcement of *Shoemaker*'s germaneness requirement by suggesting that some legislation that adds new duties

---

[93] The *Olympic Federal* court thought the legislation would have been valid if Congress had created a three-person directorate for the OTS and designated the members of the former board as the directors. The court reasoned that the germaneness requirement of *Shoemaker* would be satisfied because OTS was absorbing the duties of the old board as well as acquiring other, related ones. 732 F. Supp. at 1193. We reached a similar conclusion in 1980 in opining that Congress could merge the Court of Claims and the Court of Customs and Patent Appeals and designate the members of those courts to serve as members of the merged court. *See Legislation Authorizing the Transfer of Federal Judges from One District to Another*, 4B Op. O.L.C. 538, 541 (1980). The ''merger situation . . . involves the end of one institution and the continuance of its major functions in another,'' and it was reasonable for Congress ''to provide in this context for the relocation of experienced and capable judicial personnel, and for their continuing to perform the functions of the office to which they were originally appointed.'' *Id.*

is valid regardless of whether it satisfies the requirement. The opinion of the Court stressed the fact that "[i]n *Shoemaker*, Congress assigned new duties to two existing offices, each of which was held by a single officer. This no doubt prompted the [*Shoemaker*] Court's description of the argument as being that 'while Congress may create an office, it cannot appoint the officer.' . . . But here the statute authorized an indefinite number of military judges, who could be designated from among hundreds or perhaps thousands of qualified commissioned officers." 510 U.S. at 174. For that reason, the Court concluded, there was "no ground for suspicion here that Congress was trying to both create an office and also select a particular individual to fill the office." *Id.* The Court nevertheless went on to consider the germaneness issue and concluded that the duties of military judges are adequately related to the duties of the commissioned officers from whom the judges are selected. *Id.* at 174–76.

In a separate opinion, Justice Scalia argued that "'germaneness' is relevant whenever Congress gives power to confer new duties to anyone other than the few potential recipients of the appointment power specified in the Appointments Clause," because "taking on . . . nongermane duties . . . would amount to assuming a new 'Offic[e]' within the meaning of Article II, and the appointment to that office would have to comply with the strictures of Article II." *Id.* at 196 (Scalia, J., concurring in part and concurring in the judgment). We find Justice Scalia's reasoning persuasive and believe that in an appropriate setting the executive branch should urge the Court expressly to accept it. In light of the *Weiss* Court's detailed examination of the germaneness issue, this may not require the Court in fact to modify the doctrine of that case because it is unclear to us that the Court actually intended to hold germaneness constitutionally irrelevant in *Weiss*-type circumstances. The Court may instead simply have been emphasizing the fact that assignment of new and nongermane duties to a few specific officers not only violates the Appointments Clause per se, but also fails under the more general anti-aggrandizement principle of its decisions. We believe that it is appropriate, therefore, to review proposed new-duties legislation for germaneness even where the new duties are assigned to large or indefinite groups.

**6. The Ineligibility and Incompatibility Clauses.** The Constitution places two important restrictions on the universe of persons who may be appointed to serve as officers of the United States. U.S. Const. art. I, § 6, cl. 2.[94] The Ineligibility Clause states that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United

---

[94] One possible restriction is notable for its absence from the Constitution: although Articles I and II and the Twelfth Amendment establish citizenship and age requirements for serving as a member of Congress, the President, or the Vice President (and also set varying minimum age requirements), *see* U.S. Const. art. I, §2, cl. 2 (Representatives); *id.* art. I, §3, cl. 3 (Senators); *id* art. II, §1, cl. 4 (the President); *id.* amend. XII (Vice President), the Constitution places no such limitations on anyone who becomes an officer through one of the processes prescribed by the Appointments Clause.

States, which shall have been created, or the Emoluments whereof shall have been increased during such time." *Id.* The Clause "restricts the President's power to appoint Members of Congress," and "[i]t has long been settled within the executive branch that the President, in exercising his powers of appointment under Article II, § 2, cl. 2, will not make an appointment in violation of the . . . clause." *Members of Congress Holding Reserve Commissions,* 1 Op. O.L.C. 242, 244 (1977). The most common problem under the Ineligibility Clause arises from legislation that creates a commission or other entity and simultaneously requires that certain of its members be Representatives or Senators, either *ex officio* or by selection or nomination by the congressional leadership. Unless the congressional members participate only in advisory or ceremonial roles, or the commission itself is advisory or ceremonial, the appointment of members of Congress to the commission would violate the Ineligibility Clause. [95]

The Incompatibility Clause provides that "no Person holding any Office under the United States, shall be a Member of either House during his continuance in Office." U.S. Const. art. I, § 6, cl. 2. The Clause is primarily a restriction on Congress and its members: the Incompatibility Clause "disqualifies individuals who have already been appointed from assuming or retaining seats in Congress." *Reserve Commissions,* 1 Op. O.L.C. at 244; *cf. Members of Congress Serving in the Armed Forces,* 40 Op. Att'y Gen. 301 (1943). [96] However, the President's duty to take care that the law of the Incompatibility Clause is observed requires him or her to ensure that appointments [97] and legislation creating governmental positions are consistent with the Clause. *See, e.g., Case of the Collectorship of New Orleans,* 12 Op. Att'y Gen. 449, 451 (1868) ("in view of the" Incompatibility Clause, an executive officer's acceptance of a seat in Congress "must be considered as having the legal character of a resignation of the office"); *Appointments to the Commission on the Bicentennial of the Constitution,* 8 Op. O.L.C. 200, 207–08 (1984) (providing advice about "various structural arrangements within the Commission that might be designed to respect the Incompatibility Clause"). [98]

---

[95] After *FEC v. NRA Political Victory Fund,* 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed,* 513 U.S. 88 (1994), it appears that designating a member of Congress to serve on a commission with any executive functions, even in what was expressly labeled a ceremonial or advisory role, may render the delegation of significant governmental authority to the commission unconstitutional as a violation of the anti-aggrandizement principle. *See id.* at 826–27.

[96] The Incompatibility Clause does not prohibit members of Congress from serving in positions that are not offices in the constitutional sense. *See, e.g., Proposed Commission on Deregulation of International Ocean Shipping,* 7 Op. O.L.C. 202, 202–03 (1983) (members of Congress may serve as members of a "purely advisory" commission because the members need not be officers).

[97] *Cf. Deputization of Members of Congress as Special Deputy U.S. Marshals,* 18 Op. O.L.C. 125, 125 n.1 (1994) (recognizing Incompatibility Clause requirement but finding it unnecessary to reach that issue).

[98] The suggestion in this Office's 1977 opinion on the Clause that "exclusive responsibility for interpreting and enforcing the Incompatibility Clause rests with Congress," *Reserve Commissions,* 1 Op. O.L.C. at 242, thus was an overstatement.

**7. The Recess Appointments Clause.** With respect to officers of the United States, the Constitution vests the President with the "Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. "A long line of opinions of the Attorneys General, going back to 1823, and which have been judicially approved, has firmly established that . . . [t]he President's power to make recess appointments . . . extends to all vacancies existing during the recess regardless of the time when they arose." *Recess Appointments—Compensation*, 3 Op. O.L.C. 314, 314 (1979) (citations omitted); *accord Executive Authority to Fill Vacancies*, 1 Op. Att'y Gen. 631 (1823).[99] Although there was some early uncertainty about the President's power to make appointments under the Recess Appointments Clause during intrasession recesses, that question was settled within the executive branch by an often-cited opinion of Attorney General Daugherty concluding that the President is so authorized. *Executive Power—Recess Appointments*, 33 Op. Att'y Gen. 20 (1921). The most difficult problem of interpretation under the Clause today is determining how substantial an intrasession recess must be to give rise to the President's power.[100] Attorney General Daugherty concluded that a twenty-eight-day recess was sufficient, but cautioned that "the term 'recess' must be given a practical construction." *Id.* at 24–25. We agree with his view that the President has discretion to make a good-faith determination of whether a given recess is adequate to bring the Clause into play.[101] Giving advice on how the President may properly exercise that discretion has proven a difficult task. *See Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. 15 (1992) (eighteen-day recess a sufficient period, particularly in light of the fact that except for a brief formal session on January 3, the Senate would actually be absent for fifty-four days); *Recess Appointments*, 3 Op. O.L.C. at 316 (President may make recess appointments "during a summer recess of the Senate of a month's duration").

**8. Acting and Interim Appointments.** Early Attorneys General repeatedly opined that the President enjoyed a constitutional power of appointment empowering the President to make temporary or *ad interim* appointments to offices in cases of

---

[99] The most thorough judicial treatment of the issue, which quotes extensively from Attorney General Wirt's 1823 opinion, is *United States v. Allocco*, 200 F. Supp. 868 (S.D.N.Y. 1961), *aff'd*, 305 F.2d 704 (2d Cir. 1962), *cert. denied*, 371 U.S. 964 (1963).

[100] There must be a vacancy in order for the President to exercise the authority granted by the Recess Appointments Clause. *See Recess Appointments*, 3 Op. O.L.C. at 317 (the power to make a "recess appointment presupposes the existence of a vacancy," and an appointment cannot in itself remove an incumbent so as to create a vacancy). In many situations, whether a vacancy exists will depend on the correct interpretation of a holdover provision in the statute creating the office. The scanty case law on this issue — which is a matter of statutory construction rather than of constitutional law — is not easily reconciled. *Compare Staebler v. Carter*, 464 F. Supp. 585 (D.D.C. 1979), *with Mackie v. Clinton*, 827 F. Supp. 56 (D.D.C. 1993), *vacated as moot*, Nos. 93–5287 & 93–5289, 1994 WL 163761 (D.C. Cir. Mar. 9, 1994).

[101] "In this connection I think the President is necessarily vested with a large, although not unlimited, discretion to determine when there is a real and genuine recess making it impossible for him to receive the advice and consent of the Senate. . . . But there is a point, necessarily hard of definition, where palpable abuse of discretion might subject his appointment to review." 33 Op. Att'y Gen. at 25.

need without conforming to the requirements of the Appointments or Recess Appointments Clause. [102] Their initial reaction to congressional legislation on the subject of vacancies was therefore to view it as having neither the purpose nor the effect of supplanting the President's preexisting constitutional authority. *See Office and Duties of Attorney General*, 6 Op. Att'y Gen. 326, 352 (1854) ("Perhaps the truer view of the question is to consider the . . . statutes as declaratory only, and to assume that the power to make such temporary appointment is a constitutional one."). After the enactment of the Vacancies Act of 1868, ch. 227, 15 Stat. 168, however, the Attorneys General treated the Act as providing the exclusive means of making temporary appointments to those offices covered by the statute. *See, e.g., Appointments Ad Interim*, 17 Op. Att'y Gen. 530 (1883); *Appointments Ad Interim*, 16 Op. Att'y Gen. 596, 596–97 (1880) (authority to fill vacancy in the office of Navy Secretary is "a statutory power," and when the power is exhausted, "the President is remitted to his constitutional power of appointment"). A 1904 opinion attempted to synthesize the older and the more recent views, treating as reasonable and legitimate Congress's wish to cabin presidential discretion to make interim appointments while the Senate is in session, but describing as a "fundamental right as Chief Executive" the President's authority "to make such a temporary appointment, designation, or assignment of one officer to perform the duties of another whenever the administration of the Government requires it." *Temporary Recess Appointments*, 25 Op. Att'y Gen. 258, 261 (1904); *see also Promotion of Marine Officer*, 41 Op. Att'y Gen. 291, 294 (1956) (President has the constitutional authority to appoint "key military personnel to positions of high responsibility" without following statutory procedures).

There is little modern case law on the President's power to make temporary appointments to offices requiring Senate confirmation. [103] The "leading" judicial decision is a brief per curiam court of appeals opinion denying a motion for a stay of the district court's mandate pending appeal, *Williams v. Phillips*, 482 F.2d 669 (D.C. Cir. 1973) (per curiam). [104] Because of its procedural posture, *Williams*

---

[102] *See, e.g., Appointment of Acting Purser*, 6 Op. Att'y Gen. 357, 365 (1854) (executive power of "filling up a vacancy by an appointment of one to act *ad interim*, and for a particular exigency, in a distant service" could be exercised to make temporary appointment of acting purser despite statutory prohibition on anyone acting as purser prior to Senate confirmation); *Executive Power of Appointment*, 4 Op. Att'y Gen. 248, 248 (1843) (appointment power is derived from the President's Take Care Clause duty, "an obligation imposed by the constitution, and from the authority of which no mere act of legislation can operate a dispensation," although President could not pay interim appointees without an appropriation).

[103] Indeed, at least one court has indicated a judicial willingness to defer to the views of the Attorney General on the President's authority to make temporary appointments. *See Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1197–98 (D.D.C.) ("The Attorney General is charged with responsibility for ensuring that only lawfully appointed officials act on behalf of the United States, and consequently his interpretation of law on this subject is entitled to great deference."), *appeal dismissed as moot*, 903 F.2d 837 (D.C. Cir. 1990).

[104] *Williams* was a challenge to the legality of actions taken by the acting director of the Office of Economic Opportunity on the ground that the President lacked authority to appoint an acting director of that office and to continue the interim appointment for over four months without submitting to the Senate any nomination to the position of director. The district court declared the President's action unlawful. The court of appeals refused to grant a stay of the district court's order because in its judgment the acting director had failed to show the requisite likelihood of success on the merits The brief discussion in *Williams* of the merits emphasized that Article II "unequivocally

did not actually resolve the constitutional issue, but it suggested somewhat obliquely that what non-statutory power the President possesses to make interim appointments to offices requiring Senate confirmation can be employed only for a "reasonable time required by the President to select persons for nomination." *Id.* at 671. Looking to the thirty-day period that was, at the time, permitted temporary appointments under the Vacancies Act for an indication of what a reasonable period would be, *Williams* concluded that even if the implied power existed, a four-and-a-half-month period without any nomination was unreasonable. *Id.* at 670–71. [105] Since *Williams* was decided, the Vacancies Act has been amended to provide for an initial appointment period of 120 days. Up to two extensions, each lasting 120 days, may be made depending on the specific circumstances of the vacancy. Moreover, the Vacancies Act also tolls the running of these periods when particular conditions obtain. *See* 5 U.S.C. § 3348. [*] Thus, the Vacancies Act allows temporary appointments, in appropriate circumstances, of durations well in excess of even one year. Accordingly, we would not currently view a four-and-a-half-month temporary appointment as necessarily exceeding a reasonable duration, provided that a nomination is submitted to the Senate.

On the assumption that *Williams* can be read to indicate that "[t]o keep the Government running calls for the designation of acting officials to fill vacancies in the absence of express statutory authority," *Department of Energy—Vacancies*, 2 Op. O.L.C. 113, 117 (1978) (citing *Williams*), we have argued that the reasonableness of a given interim appointment should be measured not by a per se rule but by a variety of pragmatic factors. Those factors include "the difficulty of finding suitable candidates," *id.* at 118, "the specific functions being performed by the [interim officer]; the manner in which the vacancy was created (death, long-planned resignation) . . . and particular factors affecting the President's choice [such as] a desire to appraise the work of [the interim officer] or the President's ability to devote attention to the matter." *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287, 290 (1977). However, given the ambiguity of the *Williams* opinion, we have urged caution, even when the relevant department head has *statutory* authority to designate another official to serve in an acting capacity. *See Acting Officers*, 6 Op. O.L.C. 119, 121–22 (1982).

We recently revisited the vacancies question in relation to the United States Commission on Civil Rights. The Commission is headed by an eight-member

requires an officer of the United States to be confirmed by the Senate unless different provision is made." The court nevertheless observed that "[i]t could be argued" that the President has "an implied power, in the absence of limiting legislation . . . to appoint an acting director for a reasonable period of time before submitting the nomination of a new director to the Senate" 482 F.2d at 670.

[105] Our opinions have struggled with the meaning of *Williams. See, e.g., Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*, 1 Op. O.L.C. 150, 151–52 (1977) (court of appeals' opinion in *Williams* "can perhaps be read as disagreeing with" the argument that the President has no non-statutory authority or "as perhaps agreeing" that he does have such authority, "in the absence of a limiting statute," subject, of course, to the condition that he must submit a nomination within a reasonable time).

[*] Editor's Note: The Vacancies Act has been amended by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105–277, Div. C, tit. I, § 151(a), 112 Stat. 2681.

committee that works on a part-time basis, while its day-to-day functioning is administered by a staff director. The statute creating the position of staff director vests the authority to appoint the staff director in the President, subject to the concurrence of a majority of the members of the Commission. In keeping with the Department of Justice's long-standing position, we concluded that, when confronted with a vacancy in the position of staff director, the President has constitutional authority to appoint an acting staff director, unless Congress had statutorily limited this authority. We stated:

> The President's take care authority to make temporary appointments rests in the twilight area where the President may act so long as Congress is silent, but may not act in the face of congressional prohibition. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Thus, the Vacancies Act, 5 U.S.C. §§ 3345–3348, constitutes a restriction on the President's authority, as opposed to a source of power. If it applies to a given position, the Vacancies Act constitutes the sole means by which a temporary appointment to that position may be made.

Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights* at 3 (Jan. 13, 1994).

We concluded that Congress had not limited the President's constitutional authority with respect to the appointment of an acting staff director of the Civil Rights Commission. The Vacancies Act does not apply to the position of staff director. [106] In addition, the statute creating the position is silent on the subject of temporarily filling a vacancy in that position. Consequently, we concluded that the President was free to exercise his constitutional authority to appoint an acting staff director. [107]

9. **Other Issues of Combined, Collective, and Interbranch Authority and the Appointments Clause.** The Appointments Clause prohibits Congress or the President from obscuring the lines of authority and responsibility within the federal

---

[106] The Vacancies Act only applies to temporary appointments "[w]hen an *office*[]" is vacant. 5 U.S.C. § 3346 (emphasis added). Because the staff director for the Commission on Civil Rights is not a constitutional officer, the Vacancies Act does not apply. *See Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1195 (D.D.C.) (finding that "officer" as used in the Vacancies Act, 5 U.S.C. § 3346, means "constitutional officer"), *appeal dismissed as moot*, 903 F.2d 837 (D.C. Cir. 1990). Indeed, since the Commission is an exclusively investigatory and advisory body, *see Hannah v. Larche*, 363 U.S. 420, 441 (1960), none of the positions at the Commission are constitutional offices. *See Statement on Signing the United States Commission on Civil Rights Act of 1983*, 2 Pub. Papers of Ronald Reagan 1634, 1635 (Nov. 30, 1983) (statement by the Department of Justice). Accordingly, the Vacancies Act does not apply to the Commission at all.

[107] A federal district court ruled to the contrary, but its decision has been vacated. *See George v. Ishimaru*, 849 F. Supp. 68 (D.D.C. 1994), *vacated as moot*, No. 94–5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994).

government: the political branches cannot vest the power to perform ''a significant governmental duty'' of an executive, administrative, or adjudicative nature in any federal official who is not appointed in a manner consistent with the Clause. *Buckley v. Valeo*, 424 U.S. 1, 141 (1976) (per curiam). The Clause, however, does not prohibit creative combinations of officers and authorities as long as a person or body with legitimate appointing authority under the Clause has appointed — and therefore is accountable for — all federal officials with such power. *Cf. Weiss v. United States*, 510 U.S. 163, 191–92 (1994) (Souter, J., concurring); *Silver v. United States Postal Serv.*, 951 F.2d 1033, 1040–41 (9th Cir. 1991).

The Appointments Clause therefore does not forbid the exercise of authority by a decision-making body with a collective head that consists of principal officers and an inferior officer removable by them. *See Silver*, 951 F.2d at 1040–41. Nor is the Clause offended by the delegation of concurrent authority to a Senate-confirmed officer and her deputy when the latter is appointed by a head of department. *See Department of Housing and Urban Development—Delegations of Authority*, 2 Op. O.L.C. 87, 89–91 (1978). In both cases all of the officials performing significant governmental duties are validly appointed officers.

The exercise of authority by a group of principal officers, some of whom serve at the President's pleasure while others are removable by the President only for cause, presents no Appointments Clause issue: once again, the Clause's procedures for appointing federal officials so that they may wield ''significant authority'' have been met. The Clause's strictures are likewise satisfied by arrangements in which a head of department, pursuant to a statute, designates a subordinate to sit in his or her stead on a commission or board: if the designation by the head were authorized by statute, then it would itself be an appointment in conformity with the Clause, and even if it were not, the designee would be acting for or on behalf of the head of department, whose actions, for constitutional purposes, *are* the head's.

Finally, the Appointments Clause does not invalidate commissions composed of members or appointees from more than one branch of the government. *Mistretta v. United States*, 488 U.S. 361, 412 (1989), upheld the constitutionality of the Sentencing Commission, which includes at least three federal judges and the Attorney General as an *ex officio* non-voting member, while *Buckley* concluded that a commission consisting of a mixture of presidential appointees and members of Congress selected by the Speaker and President *pro tempore* can validly exercise ''powers . . . essentially of an investigative and informative nature,'' 424 U.S. at 137. Interbranch entities are subject to constitutional review on other grounds, including the anti-aggrandizement and general separation of powers principles, but their interbranch nature does not in itself raise any Appointments Clause question.

## C. Removal Power Issues

**1. The Executive's Removal Power.** The first great constitutional debate in the First Congress concerned the power to remove officers of the United States. A wide range of views was expressed over the respective roles — or lack thereof — of the President and Congress in removal matters, [108] but ultimately, as the Supreme Court has interpreted the "Decision of 1789," Congress rejected a legislative role in removal in favor of recognizing plenary presidential power over officers appointed by the President with the advice and consent of the Senate. *See Bowsher v. Synar*, 478 U.S. 714, 723–24 (1986); *see also Myers v. United States*, 272 U.S. 52, 111–44 (1926) (discussing debates and subsequent acquiescence in the legislative decision).

The nineteenth-century Justices interpreted the First Congress's actions as illustrative of a more general principle that "the power of removal [is] incident to the power of appointment." *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839). Thus, it was determined that inferior officers appointed by a department head were not removable by the President (absent statutory authorization to do so) but by the secretary who appointed them and that a new appointment by the proper officer amounted to a removal of the previous incumbent by operation of law. *Id.* at 260–61; *accord The President and Accounting Offices*, 1 Op. Att'y Gen. 624 (1823). In *United States v. Perkins*, 116 U.S. 483 (1886), the Court held that "when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id.* at 485. Although the Court did not address any questions about presidential removal powers, its reasoning about Congress's authority to limit department heads' removal power could logically be applied to the President with respect to inferior officers whose appointment is vested by statute in the President alone. [109] The power to suspend an officer, finally, was held to be "an incident of the power of removal." *Burnap v. United States*, 252 U.S. 512, 515 (1920) (relying primarily on nineteenth-century precedents). The Court's conclusions in *Hennen, Perkins*, and *Burnap* remain good law. [110]

---

[108] Professor Gerhard Casper has identified seven "major positions [in the First Congress] on the question of the location of the removal power," ranging from the view that the President has illimitable authority to remove any non-judicial officer to the argument that Congress has plenary discretion over removal issues under the Necessary and Proper Clause. *See* Casper, *supra* note 33, at 234–35.

[109] "The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed. The head of a Department has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto." *Perkins*, 116 U.S. at 485. The President similarly "has no constitutional prerogative" to make appointments without senatorial advice and consent "independently" of congressional authorization — that is, the President may make appointments without the advice and consent of the Senate only if Congress authorizes the President to do so. *See Myers*, 272 U.S. at 161–62 (noting without deciding the question).

[110] We do not read *Morrison v. Olson*, 487 U.S. 654 (1988), to cast any doubt on the continuing vitality of these decisions. *See id.* at 689 n.27, 690 n.29 (implicitly reaffirming *Perkins*).

The seminal twentieth-century cases on removal, *Myers* and *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), both addressed the power to remove officers appointed by the President with the advice and consent of the Senate. *Myers* held unconstitutional a statute requiring Senate approval of the President's decision to remove certain postmasters. The Court based its holding in part on its interpretation of the "Decision of 1789" and on its understanding of the President's constitutional role. "Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it the disciplinary influence upon those who act under him of a reserve power of removal. . . . Each head of a department is and must be the President's *alter ego* in the matters of that department where the President is required by law to exercise authority." 272 U.S. at 132–33. An illimitable removal power, *Myers* concluded, is a necessary incident to the President's power and responsibility to take care that the laws are faithfully executed. *Id.* at 163–64. [111]

Any suggestion in *Myers* that the Supreme Court would invalidate all limitations on the President's power to remove officers appointed with the advice and consent of the Senate was firmly repudiated less than a decade later by *Humphrey's Executor*. The case concerned the President's power to remove a member of the Federal Trade Commission ("FTC") on the grounds of policy differences, despite the existence of a for-cause removal provision in the statute establishing the Commission. [112] The Court dismissed *Myers* as inapposite because a postmaster is "an executive officer restricted to the performance of executive functions," and "the necessary reach of the decision" only "goes far enough to include all purely executive officers [and] no farther." 295 U.S. at 627–28. [113] By contrast, the Court examined the functions of the FTC and concluded that it was "an administrative body" exercising "quasi-legislative or quasi-judicial powers," rather than an agency of the executive branch. *Id.* at 628. The Court reasoned that Congress possesses the authority in creating such a body "to require [it] to act in discharge of [its] duties independently of executive control." *Id.* at 629. [114] In *Wiener v.*

---

[111] The Court dismissed the argument that the rationale for giving the President plenary removal authority over heads of department and other great officers of state simply did not apply to postmasters with the observation that Congress could extend civil service tenure protection to the latter simply by vesting their appointment "in the head[ ] of department[ ] to which they belong." 272 U.S. at 174.

[112] The statute establishing the FTC included a provision stating that a commissioner "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office," which the Court construed as intended "to limit the executive power of removal to the causes enumerated, the existence of none of which is claimed here." *Humphrey's Ex'r*, 295 U.S. at 623, 626.

[113] *Humphrey's Executor* expressly repudiated the language in *Myers* suggesting that the President's general executive powers and Take Care Clause responsibilities rendered it unconstitutional for Congress to reduce or eliminate presidential control over the administration of federal law. "In the course of the opinion [in *Myers*], expressions occur which tend to sustain the government's contention, but these are beyond the point involved and, therefore, do not come within the rule of *stare decisis*. In so far as they are out of harmony with the views here set forth, these expressions are disapproved." *Humphrey's Ex'r*, 295 U.S. at 626.

[114] *See also id.* at 628:

The Federal Trade Commission is an administrative body created by Congress to carry into effect legislative policies embodied in the [Federal Trade Commission Act, 15 U.S.C. §§ 41–42] in accordance with the

Continued

*United States*, 357 U.S. 349 (1958), the Court extended the scope of *Humphrey's Executor* by inferring the existence of a for-cause limitation on the President's power to remove an officer with quasi-adjudicatory functions, even in the absence of an express statutory removal restriction. [115]

The rationale in *Humphrey's Executor* for upholding Congress's power "to forbid [the commissioners'] removal except for cause" was in fact identical to that for recognizing the President's plenary removal power over "purely executive officers." "[I]t is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." 295 U.S. at 629. The constitutionality of congressional limitations on presidential removal authority thus depended under *Humphrey's Executor* on the legitimacy of a legislative decision to reduce or eliminate the President's control over a particular agency or officer, and that in turn depended on the nature of the functions performed by the agency or officer. [116]

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court upheld a provision of the Ethics in Government Act that forbids the removal of an independent counsel appointed under the Act except for cause. The Court explained that under "[t]he analysis contained in our removal cases," the constitutional question is whether Congress has "interfere[d] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Id.* at 689–90. *Morrison* reasoned that the Attorney General retained adequate control over the independent counsel to safeguard "the President's ability to perform his constitutional duty." *Id.* at 691.

---

legislative standard therein prescribed, and to perform other special duties as a legislative or as a judicial aid. . . . Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control.

[115] The rationale of *Wiener*, which is essentially that *Congress* must have implied a for-cause removal restriction when *the Court* believes that the functions of the agency demand such tenure protection, 357 U.S. at 353–56, seems questionable. There would be nothing illogical in a legislative decision, for example, to protect against review or revision of the *decisions* of the agency, *see id.* 354–55, while placing the agency's *decisionmakers* within the control of the President. Congress has made such decisions from the beginning of the Republic. To the extent that *Wiener* assumes that control is and ought to be a binary matter — either plenary or non-existent — its reasoning is difficult to reconcile with more recent separation of powers decisions that reject such an either/or approach to presidential control. *See, e.g., Morrison v. Olson,* 487 U.S. 654 (1988). Despite these possible flaws in its logic, however, *Wiener's* holding continues to be followed. *See FEC v. NRA Political Victory Fund,* 6 F.3d 821, 826 (D.C. Cir. 1993) (concluding that the members of the Federal Election Commission probably are removable only for cause despite the absence of an explicit statutory restriction on removal), *cert. dismissed,* 513 U.S. 88 (1994).

[116] Congress's decision was considered legitimate in *Humphrey's Executor* because the Court viewed the FTC as "a body of experts" "charged with the enforcement of no policy except the policy of the law" and concluded that "[s]uch a body cannot in any proper sense be characterized as an arm or an eye of the executive." 295 U.S. at 624, 628. We do not find the Court's reasoning in *Humphrey's Executor* completely persuasive. The Court's assertion about the FTC's "enforcement of no policy except the policy of the law," *id.* at 624, does not differentiate the FTC, except perhaps as a matter of degree, from the many undoubtedly executive agencies upon which Congress imposes mandatory duties. The Court also stated that an FTC member is "an officer who occupies no place in the executive department," but the Court may only have meant that the FTC is "an agency of the legislative or judicial departments of the government," *id.* at 628, in which case questions would arise under current constitutional doctrine as to the legitimacy of an Article I entity exercising law-making authority without following bicameralism and presentment, *see INS v. Chadha,* 462 U.S. 919 (1983), or of an Article III non-judicial entity "bind[ing] or regulat[ing] the primary conduct of the public," *Mistretta v. United States,* 488 U.S. 361, 396 (1989). We do not think that the "independent" regulatory agencies could be viewed today as within the legislative or judicial branches. *See id.* at 387 n.14 (SEC is "not located in the Judicial Branch").

*Morrison*'s broader significance is defined by the office in question. The removal restriction upheld in *Morrison* concerned an inferior officer with a sharply limited and highly unusual function, the investigation of particular allegations about the conduct of high-ranking executive branch officials. In that context, although it declined to decide "exactly what is encompassed within the term 'good cause,' " the Court held that "because the independent counsel may be terminated for 'good cause,' the Executive . . . retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act." 487 U.S. at 692. The *Morrison* Court thus had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation. [117]

The Supreme Court's removal cases establish a spectrum of potential conclusions about specific removal limitations. At one end of the spectrum, restrictions on the President's power to remove officers with broad policy responsibilities in areas Congress does not or cannot shelter from presidential policy control clearly should be deemed unconstitutional. We think, for example, that a statute that attempts to limit the President's authority to discharge the Secretary of Defense would be plainly unconstitutional and that the courts would so hold. [118] As the Court stated in *Morrison, Myers* "was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role." 487 U.S. at 690. [119] At the other end of the spectrum, we believe that for-cause and fixed-term limitations on the power to remove officers with adjudicatory duties affecting the rights of private individuals will continue to meet with consistent judicial approval: the contention that the essential role of the executive branch would be imperiled by giving a measure of independence to such officials is untenable under both precedent and principle.

---

[117] A much older decision, *Shurtleff v. United States*, 189 U.S. 311 (1903), had held that a for-cause provision did not oust the President's power, derived from the power of appointment, to remove an officer at will, but after *Humphrey's Executor*, *Shurtleff* appeared confined to its factual setting (where the official's tenure had no fixed termination). *See Kalaris v. Donovan*, 697 F.2d 376, 395 & n.76 (D.C. Cir.), *cert. denied*, 462 U.S. 1119 (1983). *Bowsher*, however, cited *Shurtleff* in connection with a more general suggestion that "the enumeration of certain specified causes of removal" may not "exclud[e] the possibility of removal for other causes." 478 U.S. at 729. *Bowsher* and *Morrison* together suggest that a generous reading of the President's (or a department head's) power to remove an inferior officer for cause may be essential to the constitutionality of removal restrictions concerning even those officers whose functions are narrow.

[118] The Tenure of Office Act of 1867, ch. 154, 14 Stat. 430, expressly provided the Secretaries of War and the Navy, among others, with terms longer than that of the President who appointed them, subject only to presidential removal with the consent of the Senate. President Andrew Johnson's attempt to remove the Secretary of War was the legal basis for his impeachment and near-removal from office. The Act had been passed over President Johnson's constitutionally based veto.

[119] With respect to an officer serving at the President's pleasure, the President may remove the incumbent by direct order or by appointing his or her successor after receiving the advice and consent of the Senate. *See, e.g., Quackenbush v. United States*, 177 U.S. 20, 25 (1900); *Presidential Appointees—Resignation Subject to the Appointment and Qualification of a Successor*, 3 Op. O.L.C. 152 (1979).

Between these two extremes, the arguments are less clear, and it is imperative that the executive branch carefully examine removal limitations in pending legislation for their impact on the President's ability to exercise his or her constitutional powers and carry out his or her duties. In situations in which Congress does not enact express removal limitations, we believe that the executive branch should resist any further application of the *Wiener* rationale, under which a court may infer the existence of a for-cause limit on presidential removal, except with respect to officers whose only functions are adjudicatory. [120] In reviewing pending legislation, furthermore, we should be aware that legislative silence about the President's removal power over administrative agency officers invites judicial policy choices that may be contrary to those the President or Congress intended.

**2. Congressional Removal Power.** Unless it limits its own discretion by statute, Congress enjoys plenary authority to remove its own officers, as do the individual houses of Congress. [121] In addition, Congress has the general authority to legislate in ways that in fact terminate an executive branch officer's or employee's tenure by defunding a position, for example, or by legislating mandatory retirement rules that apply to incumbents. [122] The executive branch, however, has long maintained that the Constitution does not permit this legislative authority to be deployed abusively as a de facto removal power. *See Civil Service Retirement Act—Postmasters—Automatic Separation from the Service*, 35 Op. Att'y Gen. 309, 312–15 (1927) (deeming mandatory retirement statute constitutional because it could not fairly be viewed as an encroachment on the President's removal power). The Supreme Court's decisions confirm the executive position. In *Myers v. United States*, 272 U.S. 52 (1926), the Court at one point portrayed the issue before it in terms of congressional aggrandizement, *id.* at 161, and modern decisions have redescribed the enduring rationale of *Myers* in anti-aggrandizement terms. *See Morrison v. Olson*, 487 U.S. 654, 686 (1988) ("[T]he essence of the decision in *Myers* was the judgment that the Constitution prevents Congress from 'draw[ing] to itself . . . the power to remove.'") (quoting *Myers*, 272 U.S. at 161); *Bowsher v. Synar*, 478 U.S. 714, 724–26 (1986). Legislation that can properly be described as exercising the power of removal is unconstitutional, therefore, because it amounts to an attempt on Congress's part "to gain a role in the removal of executive officials other than its established powers of impeachment and con-

---

[120] On the basis of precedent, and in light of the understandable tendency of Article III judges to value tenure protection positively, it is safe to assume that courts will continue to apply *Wiener* with respect to officials whose primary duties involve the adjudication of disputes involving private persons.

[121] The two houses of Congress also have complementary roles in the congressional power to impeach and remove any civil officer of the United States. *See* U.S. Const. art. I, §2, cl. 5; *id.* art. I, §3, cl. 6.

[122] Congress's authority in this regard is bounded, to be sure, by independent constitutional limitations such as the Bill of Attainder Clause, U.S. Const. art. I, §9, cl. 3. *See United States v. Lovett*, 328 U.S. 303 (1946) (provision in an appropriations statute prohibiting the payment of compensation to three specified executive branch employees because of their political beliefs was an unconstitutional bill of attainder).

viction." *Morrison*, 487 U.S. at 686. [123] We think, for example, that "ripper" legislation that ostensibly abolished an office while simultaneously proceeding to recreate it would be a transparent, and unconstitutional, attempt to remove the officer in question and therefore would violate the anti-aggrandizement principle. *See Constitutionality of Proposed Legislation Requiring Renomination and Reconfirmation of Executive Branch Officers Upon the Expiration of a Presidential Term*, 11 Op. O.L.C. 25, 26 (1987).

The executive branch also has resisted attempts by the Senate to "reconsider" the nomination of an officer to whose appointment that body has already given its advice and consent once the President has taken steps to complete the appointment. In 1931, for example, President Hoover declined to return to the Senate resolutions notifying him that it had confirmed three nominees to the Federal Power Commission. The President explained that "the return of the documents by me and reconsideration by the Senate would be ineffective to disturb the appointees in their offices. I cannot admit the power in the Senate to encroach upon Executive functions by removal of a duly appointed executive officer under the guise of reconsideration of his nomination." Message to Senate, January 10, 1931, *quoted in United States v. Smith*, 286 U.S. 6, 28 n.3 (1932); *see also Smith*, 286 U.S. at 37–48 (discussing historical practice). Such senatorial action is both an unconstitutional attempt to remove the officer and a violation of the anti-aggrandizement principle, in that it is a legislative attempt to exercise power after the constitutionally prescribed role of the legislative body has been completed. [124]

## D. Issues Involving the Boundaries of the Legislative Sphere

The Supreme Court decisions articulating the Court's anti-aggrandizement principle make it plain that Congress's formal authority is limited to the enactment of legislation and activities in aid of the legislative process such as investigation and oversight. The Gramm-Rudman Act's vesting in a congressional agent of the power to exercise policy-making control over the post-enactment decisions of executive officials is the paradigmatic example of congressional action in violation of this limitation. *See Bowsher v. Synar*, 478 U.S. 714 (1986) (invalidating the relevant provision of the Act). Respect for Congress's legitimate and broad authority to legislate is consistent with our duty as officials of the executive branch

---

[123] One could also describe the reasoning directly in terms of the impeachment and removal powers. *See* U.S. Const. art. I, §2, cl. 5 (giving House the "sole Power of Impeachment"); *id.* art. I, §3, cl. 6 (giving Senate the "sole Power to try all Impeachments"); *id.* art. II, §4 ("President, Vice President and all civil Officers" are subject to impeachment and removal). These powers stem from "[e]xplicit and unambiguous provisions of the Constitution [that] prescribe and define" the only means by which Congress may remove officers. *INS v. Chadha*, 462 U.S. 919, 945 (1983).

[124] In *Smith* the Supreme Court rejected a challenge to the right of one of President Hoover's appointees to sit on the Federal Power Commission, but based its holding on its construction of the Senate's rule permitting reconsideration. The Court thus did not reach the Executive's constitutional arguments. *See* 286 U.S. at 34 ("[W]e have, therefore, no occasion to consider the constitutional objection.").

to identify instances in which Congress transgresses the boundaries of its constitutional sphere of operations.

**1. The Paradox of Congressional Agencies.** From reading the bare text of the Constitution, one might not expect there to exist any formally separate entities within the legislative branch other than the two houses themselves. From an early date, however, Congress has created distinct agencies, under its special supervision, for various purposes. Some of these agencies, or the officers who head them, exercise authority that seems incompatible or at least difficult to reconcile with the Supreme Court's anti-aggrandizement decisions. Of special interest are the Smithsonian Institution (and its subordinate bureaus, such as the John F. Kennedy Center for the Performing Arts ("J.F.K. Center")), the Library of Congress, the General Accounting Office ("GAO") (headed by the Comptroller General), the Government Printing Office ("GPO"), and the Office of the Architect of the Capitol. [125] The head of each of these agencies exercises authority with respect to executive officials or private persons that could be seen as problematic under *Bowsher v. Synar*, 478 U.S. 714 (1986), which held unconstitutional the Comptroller General's exercise of controlling authority over executive branch budgeting.

We believe that many of the powers currently exercised by the presently existing congressional agencies may be deemed constitutionally harmless. Most of the functions undertaken by the Library of Congress, the basic accounting tasks of the GAO, and all of the duties of the Architect of the Capitol can comfortably be described as in aid of the legislative process. *See Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928). The activities undertaken by the Smithsonian and its bureaus also seem to fit under a broad construction of that concept, a construction that is supported by historical practice stretching far back into the antebellum Republic. *Cf. Springer*, 277 U.S. at 211 (Holmes, J., dissenting) ("Congress long ago established the Smithsonian Institution, to question which would be to lay hands on the Ark of the Covenant."). The GPO's involvement in executive branch printing is also supported by a substantial historical pedigree, *see* Act of June 23, 1860, 12 Stat. 117, but in the twentieth century the executive branch has repeatedly been compelled to resist congressional attempts to empower the GPO to exercise genuine discretion over executive decisions. [126] The review authority of the Librarian of Congress over the Copyright Arbitration Royalty Panel, *see* 17 U.S.C. §§ 801–803, is permissible because the Librarian's tenure is not protected by an explicit for-cause removal limitation, and we therefore infer that the

---

[125] The composition of the Smithsonian's Board of Regents and of the Board of Trustees of the J.F.K. Center presents a separate problem under *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), because members of Congress serve on these boards through appointment by the Speaker and the President *pro tempore*. *See* 20 U.S.C. § 42 (Regents of Smithsonian); *id.* § 76h(a) (Trustees of J.F.K. Center).

[126] Under the modern understanding of the separation of powers, we do not think that Congress validly can empower the GPO to play any role that is not purely ministerial with respect to the executive branch.

President has at least the formal power to remove the Librarian at will. [127] We note that the historical lineage of, and long-standing acquiescence of the Presidents in, these legislative agencies and most of their activities are important to our conclusion that those activities are constitutionally permissible: we think it highly doubtful that Congress constitutionally could create new legislative agencies with operational powers, or afford existing agencies novel powers, with respect to executive officials or private persons.

Our conclusion about the limits on Congress's authority to create legislative branch agencies with powers reaching beyond the legislative branch is consistent with the decision in *Hechinger v. Metropolitan Washington Airports Authority*, 36 F.3d 97 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995), where the court of appeals held unconstitutional Congress's response to the Supreme Court's decision in *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991) (*"MWAA"*). After *MWAA* struck down a congressionally constituted board with the power to review and reverse the decisions of the Airports Authority, Congress created a similar, congressionally controlled board of review with the power to delay, but not to control, the Authority's implementation of decisions. The court rejected the argument that the new board's powers were constitutional because of this distinction: the very purpose of this board was to bring congressional policy views to bear on the decisions of the Authority by enabling congressional agents to participate directly in the Authority's decision-making processes. Under the Supreme Court's rigorous understanding of the anti-aggrandizement principle, any such extension of legislative power beyond the legislative sphere is invalid. We therefore believe that *Hechinger* was correctly decided.

**2. Reporting Requirements.** Many statutes empower executive branch agencies to take certain actions only after a specified period following the provision of notice or of a report to Congress. The Department of Justice has long acknowledged the constitutionality of such report-and-wait provisions, *see, e.g., Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 63 (1933) ("No one would question the power of Congress to provide for delay in the execution of . . . an administrative order."), and the Supreme Court in *INS v. Chadha*, 462 U.S. 919 (1983), "specifically recognized" report-and-wait requirements "as a constitutionally acceptable alternative to the legislative veto." *Implementation of the Bid Protest Provisions of the Competition in Contracting Act*, 8 Op. O.L.C. 236, 246 (1984); *see Chadha*, 462 U.S. at 935 n.9, 955 n.19. While individual instances of congressional investigation and oversight may be objectionable on policy grounds, and in certain situations may involve information

---

[127] Formal removal authority is sufficient to render the Librarian subject to the President's control for constitutional purposes. *See Bowsher v. Synar*, 478 U.S. 714, 726–27 (1986). We think that under *Bowsher* the fact that a President is highly unlikely to remove a Librarian is legally irrelevant. *Id.* at 727 n.5.

with respect to which the President is constitutionally entitled to assert executive privilege, the conduct of investigation into, and oversight concerning, executive actions is generally well within the power of Congress. *See Buckley v. Valeo,* 424 U.S. 1, 137–38 (1976) (per curiam). [128] Report-and-wait provisions generally are constitutional means of assisting Congress in carrying out these legitimate activities. [129]

Simple reporting requirements, which again are sometimes objectionable on policy grounds, are clearly constitutional as a general matter. "Congress may at all times call on [the heads of executive departments] for information or explanation in matters of official duty." *Office and Duties of Attorney General,* 6 Op. Att'y Gen. 326, 344 (1854); *see Chadha,* 462 U.S. at 955 n.19; *see also Duties of the Attorney General,* 1 Op. Att'y Gen. 335, 336 (1820) (Congress could, by legislation, require the Attorney General to prepare a report on claims against the United States). In the past, this Office has made constitutional objections to so-called "concurrent" reporting provisions that require an executive agency to submit a given report simultaneously to the President and Congress. *See Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress,* 6 Op. O.L.C. 632 (1982); *Inspector General Legislation,* 1 Op. O.L.C. 16, 17 (1977). The argument is that such provisions interrupt the lines of responsibility within the executive branch and interfere with a presidential prerogative to control the presentation of the executive branch's views to Congress. On the other hand, advocates of such provisions might argue that a concurrent reporting provision does not, as a formal matter, enlarge congressional powers at the expense of the Executive, because the power to require information is well within Congress's legitimate legislative authority.

We think that concurrent reporting requirements are best analyzed under the general separation of powers principle. That principle first requires an inquiry into "the extent to which" a given reporting provision "prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Adminis-*

---

[128] The Constitution presupposes that all executive branch action is taken under the legal authority of officers of the United States and that it is those officers (and not their subordinates) who are *constitutionally* responsible for those actions. *See* U.S. Const. art. II, § 4 (civil officers may be impeached). It is our view, therefore, that the executive branch is generally entitled to resist congressional demands that employees be questioned about their actions and that as a matter of constitutional comity Congress ordinarily is obligated to respect an executive decision to send a superior officer to present testimony and answer questions about the actions of a subordinate officer. (This does not apply to congressional investigations connected with impeachment or with other legitimate investigations into the actions of specific officers.). Although the details of executive responses to congressional demands for information have changed somewhat, the general principle that Congress ought not employ its powers of investigation to disrupt the lines of responsibility and authority within the executive branch is very old. *See* Thomas Jefferson, Opinion of the Cabinet (Apr. 2, 1792), *in* 1 *The Writings of Thomas Jefferson* 304 (Andrew A. Lipscomb ed., 1903) (advising President Washington "that neither the committee nor [the] House [of Representatives] had a right to call on the Head of a Department, who and whose papers were under the President alone, but that the committee should instruct their chairman to move the House to address the President").

[129] This is not to say that an unconstitutional report-and-wait provision cannot be imagined. A provision that imposed so lengthy a delay as to in effect nullify the Executive's power to take action substantively authorized by the Constitution or a statute might be invalid as a violation of the anti-aggrandizement or general separation of powers principle.

*trator of Gen. Servs.*, 433 U.S. 425, 443 (1977) (citation omitted). Many conceivable concurrent reporting requirements, particularly ones touching on the President's responsibility for the conduct of foreign affairs and for national defense, would have a serious negative impact on the President's performance of his "constitutionally assigned functions." A statutory requirement that the Secretary of State report simultaneously to the President and Congress on the status of United States relations with a given foreign power, for instance, would fall within that description. [130] Similarly, legislation that attempted to impose concurrent reporting requirements across a broad spectrum of executive branch activities might well constitute so serious an interference with the President's fulfillment of his obligations under the Take Care Clause, U.S. Const. art. II, § 3, that it should be deemed invalid. The courts, however, might uphold the validity of a concurrent reporting requirement imposed for a legitimate congressional purpose on a specific agency with limited, domestic, and purely statutory duties.

As a practical political matter, concurrent reporting requirements clearly weaken the President's control over the executive branch and by doing so increase congressional leverage on the President and other officials of the executive branch. By doing so they impair the Constitution's " 'great principle of unity and responsibility in the Executive department.' " *Myers v. United States*, 272 U.S. 52, 131 (1926) (quoting James Madison *in* 1 Annals of Congress 499 (Joseph Gales ed., 1789)). For this reason, we think the presumption should be that the executive branch will object to any concurrent reporting provision in proposed legislation.

**3. Congressional Agents in Non-Legislative Contexts.** The Supreme Court's decisions make it clear that legislation placing members or agents of Congress on a board or commission that is outside the legislative branch is immediately suspect. The constitutional "location" of a given entity is not a matter of congressional fiat; Congress cannot define away an anti-aggrandizement problem simply by declaring that a given entity is within or without the legislative branch. [131] The question is, we think, a matter of the relationship between the entity's functions and the formal powers Congress can assert over and through it. In *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991), for example, the board at issue was the board of review of an entity, the Airports Authority, created by a compact between Virginia and the District of Columbia, and the review board members were appointed by the

---

[130] Moreover, such a provision ought to fail the courts' final test under general separation of powers analysis — whether the statute's impact on the executive "is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Administrator of Gen. Servs.*, 433 U.S. at 443. The hypothesized reporting requirement could seriously impair the President's ability to formulate foreign policy and conduct negotiations and addresses an area in which Congress's constitutional authority is limited.

[131] The result in *Bowsher v. Synar*, 478 U.S. 714 (1986), for example, would not be changed by a statute providing that the General Accounting Office is an executive branch agency. Through the Comptroller General, an official removable by Congress, the legislature would still be exercising ultimate authority over executive decisions. In fact, the Comptroller General does have obligations to the executive branch as well as to Congress. *See Bowsher*, 478 U.S. at 746 (Stevens, J., concurring in judgment).

Authority. However, by federal legislative mandate, the Authority was compelled to appoint a review board made up exclusively of members of Congress selected from a pool determined by Congress. *See id.* at 268–69. Congress's agents on the board thus were able to exercise ultimate control over important operational decisions of the Airports Authority, in violation of the Constitution's constraints on the exercise of congressional power. *Id.* at 275–77.

The Court of Appeals for the D.C. Circuit recently came to a similar conclusion in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994), in striking down part of a section of the Federal Election Campaign Act, 2 U.S.C. § 437c(a)(1). That section provides that the Secretary of the Senate and Clerk of the House or their designees are to be members of the Federal Election Commission "ex officio and without the right to vote." The Secretary and the Clerk are self-evidently agents of Congress, but the Commission argued that their presence was constitutionally harmless because their only formal role was informational and advisory. The court rejected the argument, reasoning that the very point of placing the Secretary and Clerk on the Commission was to influence the Commission's actions and that

> Congress must limit the exercise of its influence, whether in the form of advice or not, to its legislative role. . . . What the Constitution prohibits Congress from doing, and what Congress does in this case, is to place its agents "beyond the legislative sphere" by naming them to membership on an entity with executive powers.

6 F.3d at 827 (citation omitted). We believe that *NRA Political Victory Fund* was correctly decided: however modest the ability of Congress's agents to influence the Commission's actions may have been formally, the statute placed the agents intended to communicate that influence within the very heart of an agency charged with enforcing federal law. The anti-aggrandizement principle properly can be interpreted to forbid even modest attempts by Congress to intervene in the enforcement of the laws once "its participation [in the passage of legislation] ends." *Bowsher v. Synar*, 478 U.S. 714, 733 (1986).

## E. The General Separation of Powers Principle

The proper application of the general separation of powers principle is highly specific to context, and thus few generalizations are possible. For example, in the past we have expressed concern that legislation delegating federal authority to state or local officials or private persons could undermine the executive branch's ability to carry out its functions and thereby violate the principle. *See, e.g., Constitutional Limits on "Contracting Out" Department of Justice Functions*

*under OMB Circular A–76*, 14 Op. O.L.C. 94, 99–101 (1990). [132] We continue to believe that such delegations can raise questions with respect to the constitutional separation of powers, [133] and that in certain circumstances, a congressional delegation of authority to non-federal officials or to private parties might have a significant impact on the executive branch's ability to fulfill its constitutional functions. If so, the delegation might be invalid under the general separation of powers principle. [134]

---

[132] The delegation question actually at issue in our 1990 opinion concerned OMB requirements to contract out governmental work. Executive branch delegations to non-federal entities, we now think, are properly analyzed as raising issues about the Executive's statutory authority to delegate.

[133] In theory, Congress's authority to delegate law-making authority to *anyone*, including the President, is limited by the non-delegation doctrine, which prohibits standardless grants of legislative power. That doctrine is, however, essentially moribund in the courts. *See, e.g., Yakus v. United States*, 321 U.S. 414 (1944) (upholding broad delegation). In any event, the problem of delegation in the separation of powers context is not, or not primarily, one of congressional failure to specify the limits and standards relevant to the delegated authority, but rather the interference with executive (or judicial) branch functions created by the bestowal of federal-law authority on non-federal entities. *Cf. Currin v. Wallace*, 306 U.S. 1, 15–16 (1939) (upholding statute requiring supermajority vote by participants in regulated activity before executive branch could take certain action).

[134] A common form of "delegation" — the grant of authority to state, local, or tribal officials or to private parties to stop federal action by declining to consent to it — is unlikely to present a constitutional problem. Such legislation merely sets a condition on the executive branch's exercise of authority that the Executive would not possess at all in the absence of the legislation. In upholding a statute requiring a supermajority of regulated farmers to agree before the Secretary of Agriculture could exercise certain powers, the Supreme Court rejected the argument that the statute impermissibly delegated legislative power, reasoning that such legislation does not, strictly speaking, involve a *delegation* of authority to the farmers at all. *See Currin v. Wallace*, 306 U.S. 1, 15–16 (1939). By requiring the Secretary, as one of the prerequisites to the exercise of power granted him by statute, to ascertain the agreement of a certain percentage of those who would be affected, the statute at issue in *Currin* had done nothing but add another condition to the availability of the power. *Id.* at 15 ("Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.'").

A recent district court opinion that reached the opposite conclusion illustrates, in our judgment, the fallacy involved in attempting to discern a separation of powers problem in this sort of legislation. *See Confederated Tribes of Siletz Indians v. United States*, 841 F. Supp. 1479 (D. Or. 1994), *aff'd on other grounds*, 110 F.3d 688 (9th Cir.), *cert. denied*, 522 U.S. 1027 (1997). The statute at issue prohibits the location of gaming establishments on land acquired by the Department of the Interior in trust for the benefit of a Native American tribe when the land in question is off-reservation. The statute permits the Secretary to grant a waiver of the prohibition, but requires him or her to obtain the concurrence of the relevant state governor before finally approving the waiver. The district court denied that the act was similar for constitutional purposes to the legislation upheld in *Currin* or the False Claims Act provisions sustained in the *qui tam* cases: "Instead we have a statute in which Congress delegates to a state official the power to veto a favorable determination by an official of the Executive Branch who was legislatively charged with making that determination." 841 F. Supp. at 1488. Therefore, the court concluded, the provision requiring the governor's concurrence violated the Appointments Clause and the general separation of powers principle. *Id.* at 1489. We think that the district court went wrong in its description of the legislation it was reviewing: the *only* final determination the Secretary is "legislatively charged with making" under 25 U.S.C. § 2719(b)(1)(A) is a determination that the statutory conditions — inter alia, that the relevant governor concurs in the Secretary's findings that granting the waiver will be beneficial to the tribe and harmless to its neighbors — have been satisfied. The governor's concurrence, from the Secretary's perspective, is as much a fact about the world as the predicted effects of the casino (or the concurrence of the supermajority of farmers at issue in *Currin*); it is one more condition that must be met before the Secretary can exercise the waiver power Congress has provided, albeit a condition that the Secretary may be able to satisfy using different methods (persuasion, for example) than those employed in satisfying other conditions (economic forecasts of the impact of a casino, for example).

For somewhat similar reasons, there is no separation of powers problem with legislation that defines a federal rule of law by reference to state or foreign law. The Supreme Court held in *United States v. Sharpnack*, 355 U.S. 286 (1958), that the Constitution permits Congress to provide for the application, as bases for federal prosecution, of subsequently enacted state criminal laws in federal enclaves. The Court concluded that such a prospective congressional adoption of "future state legislative action in connection with the exercise of federal legislative power" does not involve "a delegation by Congress of its legislative authority to the States" at all. *Id.* at 294. On the basis

Continued

177

## F. Statutory Construction

Issues involving the constitutional separation of powers between the President and Congress most often arise in the context of a statute that raises or proposed legislation that would raise questions under one of the three headings we have identified. For this reason, it is worth recalling the "cardinal principle" of statutory interpretation that statutes be construed to avoid raising serious constitutional questions, where such a construction is reasonably available. *See, e.g., Crowell v. Benson,* 285 U.S. 22 (1932).

An important subset of these questions relate to statutes that do not plainly state that they apply to the President. The Supreme Court and this Office have adhered to a plain statement rule: statutes that do not expressly apply to the President must be construed as not applying to the President, where applying the statute to the President would pose a significant question regarding the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts,* 505 U.S. 788, 800–01 (1992); *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges,* 19 Op. O.L.C. 350 (1995). This principle has two sources in the constitutional context within which the Congress drafts statutes. The first is the interpretive canon of avoiding serious constitutional questions. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988).

The second source is the constitutional principle of separation of powers. The purpose of the constitutional separation of powers is to prevent an excessive accumulation of authority in any of the three branches of the federal government. The plain statement safeguards "the 'usual constitutional balance'" of power. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242 (1985)); *see Franklin,* 505 U.S. at 800–01. Given the central position that the separation of powers doctrine occupies in the Constitution's design, this rule also serves to "assure[ ] that the legislature has in fact faced, and intended to bring into issue, the critical matters" of the balance of power among the three branches of the federal government. *See United States v. Bass,* 404 U.S. 336, 349 (1971).

This plain statement rule has been applied frequently by the Supreme Court as well as this Office with respect to statutes that might otherwise be susceptible of an application that would affect the President's constitutional prerogatives, were one to ignore the constitutional context. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act ("APA"), 5 U.S.C § 701, authorized "abuse of discretion" review of final actions by the

---

of *Sharpnack*'s reasoning, we think that no special separation of powers issues are raised by the role of the states under such legislation. The courts of appeals have applied the rationale of *Sharpnack* to a variety of federal statutes that require consideration of state or foreign laws in determining the application of federal law. *See, e.g., United States v. Rioseco,* 845 F.2d 299, 302 (11th Cir. 1988) ("Congress has delegated no power, but has itself set out its policies and has implemented them.").

President. The APA authorizes review of final actions by an "agency," which it defines as "each authority of the Government of the United States." 5 U.S.C. § 701(b)(1). From this definition, the APA expressly exempts Congress, the courts, the territories, and the District of Columbia government.

Even though the statute defined "agency" in a way that could include the President and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court,

> [t]he President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would *require* an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

505 U.S. at 800–01 (emphasis added). To amplify, she continued, "[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements." *Id.* at 801. Numerous other Supreme Court decisions employ this approach. *See, e.g., Public Citizen v. United States Dep't of Justice,* 491 U.S. 440 (1989) (holding that the Federal Advisory Committee Act does not apply to committees that advise the President on the discharge of his exclusive constitutional functions because doing so would raise serious separation of powers questions); *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155 (1993) (refusing to give the Refugee Act extraterritorial application because doing so could conflict with the President's constitutionally committed authority); *Nixon v. Fitzgerald,* 457 U.S. 731 (1982) (holding the President immune from suit because Congress had failed to create a cause of action expressly against the President of the United States).

In addition to the Supreme Court precedents, this Office has frequently applied the plain statement rule in the context of the separation of powers between the executive and legislative branches. For example, we were asked whether the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, prohibits the President from considering the age of judicial candidates when determining whom to nominate for federal judgeships. *See Judges—Appointment—Age Factor,* 3 Op. O.L.C. 388 (1979). We concluded that the ADEA should not be read to apply to the presidential appointment of federal judges:

> The power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President. It provides one of the

179

few administrative mechanisms through which the President can exert a long-term influence over the development and administration of law in the courts. The President's present power to exert that influence to the fullest by preferring candidates for appointment who are likely to have long, rather than short, careers on the bench is therefore a matter of constitutional significance. Whether Congress could deny the President that power by requiring him to disregard utterly the age of candidates for appointment has never been considered by the courts, but because of the gravity of the constitutional questions it raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way, absent a very clear indication in the [statute].

*Id.* at 389. [135]

### III. Constitutional Requirements and Policy Concerns

The conclusion that a particular provision of proposed legislation probably would not be held unconstitutional by the courts is not equivalent to a determination that the legislation is constitutional per se. The judiciary is limited, properly, in its ability to enforce the Constitution, both by Article III's requirements of jurisdiction and justiciability and by the obligation to defer to the political branches in cases of doubt or where Congress or the President has special constitutional responsibility. [136] In such situations, the executive branch's regular obligation to ensure, to the full extent of its ability, that constitutional requirements are respected is heightened by the absence or reduced presence of the courts' ordinary guardianship of the Constitution's requirements. Furthermore, even where on any view the letter of the Constitution is satisfied, the Constitution's intention to separate the federal government's powers can appropriately be invoked as a sound reason for objecting to legislation that undermines or imperils that separa-

---

[135] *See also Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges,* 19 Op. O.L.C. 350 (1995); *Constraints Imposed by 18 U.S.C. §1913 on Lobbying Efforts,* 13 Op. O.L.C. 300, 304–05 (1989); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101 (1984); Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, *Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974); Memorandum for Egil Krogh, Staff Assistant to the Counsel to the President, from William H. Rehnquist, Assistant Attorney General, *Re: Closing of Government Offices in Memory of Former President Eisenhower* (Apr. 1, 1969).

[136] This last point is true not only with respect to true "political questions," i.e., constitutional issues the resolution of which is committed by the Constitution to (one of) the political branches, but also as to areas which, although not absolutely insulated from judicial review, demand extraordinary judicial respect for the decisions of a coordinate branch. *See, e.g., United States v. Butenko,* 494 F.2d 593, 603, 605 (3d Cir.) (en banc) (broad presidential power to order covert surveillance for foreign affairs and national security purposes does not "justify completely removing" judicial enforcement of the Fourth Amendment; however, the "strong public interest" in "the efficient operation of the Executive's foreign policy-making apparatus" should make a court "wary of interfering"), *cert. denied,* 419 U.S. 881 (1974).

tion. The constitutional separation of powers, to make the point in a different way, is a political as well as a legal principle. [137]

The Constitution demands of the executive and legislative branches alike an "ethic of institutional responsibility" in defending their respective roles in the overall constitutional structure. [138] For example, legislation that attempts to structure the very details of executive decision making, or that imposes onerous and repetitive reporting requirements on executive agencies, is troubling from a separation of powers standpoint even if the individual statutes could not easily be described in themselves as unconstitutional. The overall effects of such micromanagement for the constitutional separation of powers obviously can be tremendous, and yet it is unlikely that judicial intervention can or would preserve the constitutional balance. The executive branch thus has the primary responsibility for presenting, in as forceful and principled a way as possible, the separation of powers problems with all legislation that has such effects. In carrying out this Office's various roles in the Executive's review of existing and proposed legislation, we intend to bear this obligation in mind, and we are pleased to be of assistance to other components of the executive branch in their efforts to analyze, from a policy standpoint as well as from a strictly legal perspective, the impact of legislation on the constitutional separation of congressional and presidential powers.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[137] Justice Robert Jackson once wrote that "[i]t is hard to conceive a task more fundamentally political than to maintain amidst changing conditions the balance between the executive and legislative branches of our federal system." Robert H. Jackson, *The Supreme Court in the American System of Government* 62 (1955).

[138] *See* Richard A. Champagne, Jr., *The Separation of Powers, Institutional Responsibility, and the Problem of Representation*, 75 Marq. L. Rev. 839, 844 (1992).